**ALLIANCE TO PROTECT NANTUCKET SOUND, INC.; Ronald Borjeson; Wayne Kurker; Shareen Davis; Ernest Eldredge; David Ellsworth; Robert Hazelton; Osterville Anglers Club, Inc.; and Hyannis Anglers Club, Inc., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF THE ARMY; Honorable Thomas E. White, Secretary of the Army; United States Army Corps of Engineers; LT. General Robert B. Flowers, Chief of Engineers, United States Army Corps of Engineers; and Colonel Thomas L. Koning, District Engineer, United States Army Corps of Engineers, Defendants,**

**CAPE WIND ASSOCIATES, LLC, Intervenor.**

**No. CIV.A.02–11749–JLT.**

United States District Court, D. Massachusetts.

Sept. 18, 2003.

Benjamin S. Sharp, Donald C. Bauer, Perkins Coie LLP, Washington, DC, Gary L. Gill–Austern, Nutter, John P. Driscoll, Martin C. Pentz, McClennen & Fish, LLP, Boston, MA, for Plaintiffs.

Anton P. Giedt, United States Attorney's Office, Boston, MA, Jon M. Lipshultz, Environmental Defense Section, Washington, DC, for Defendants.

Michael David Vhay, Piper Rudnick LLP, Stephen H. Oleskey, Hale & Dorr, LLP, Boston, MA, Robert D. Smith, Town of Barnstable, Hyannis, MA, Ann L. Carpenter, Sullivan, Weinstein & McQuay, P.C., Boston, MA, John C. Creney, John C. Creeney PC, Yarmouth Port, MA, Darlington P. Hicks, Conservation Law Foundation, William L. Pardee, Attorney General's Office, Boston, MA, for Movants.

## MEMORANDUM

TAURO, District Judge.

This action is the second skirmish in what may prove to be a protracted struggle over the construction of a wind energy plant in Nantucket Sound, Massachusetts.[1] It involves a challenge by Plaintiffs [2] to the

---

1. The first skirmish dealt with the question of whether both a permit from the federal government and a license from the Commonwealth of Massachusetts were required before a monopole structure could be constructed in an area of Nantucket Sound more than three miles off the coast of Massachusetts. In view of the federal government's exclusive jurisdiction over waters more than three miles from shore (and the absence of any applicable delegation of that jurisdiction), this court held that a license from the Commonwealth was not required. *See Ten Taxpayers Citizen Group v. Cape Wind Assocs., LLC,* 278 F.Supp.2d 98 (D.Mass.2003).

2. The named Plaintiffs are: Alliance to Protect Nantucket Sound, Inc.; Ronald Borjeson; Wayne Kurker; Shareen Davis; Ernest Eldredge; David Ellsworth; Robert Hazelton;

decision of the United States Army Corps of Engineers ("Corps"), one of the named Defendants,[3] to issue a permit to Cape Wind Associates, LLC ("Cape Wind" or "Intervenor")[4] under section 10 of the Rivers and Harbors Appropriation Act of 1899 ("section 10").[5] The permit authorized Cape Wind to construct a Scientific Measurement Devices Station ("data tower" or "tower") on an area of the seabed in Nantucket Sound that is located on the Outer Continental Shelf ("OCS").[6]

Plaintiffs assert that: (1) the Corps lacked the authority to issue a section 10 permit for activities on the OCS unrelated to the extraction of resources from the seabed, (2) the Corps' decision to issue the permit was unlawful because it knew that Cape Wind did not have and could not obtain the property interest in OCS lands that, according to Corps regulations, it needed to undertake construction of the data tower, and (3) the Corps failed in a variety of ways to satisfy its obligations under the National Environmental Policy Act ("NEPA").[7] Defendants and Intervenor contest each of those assertions.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs have moved for summary judgment. Defendants and Intervenor oppose Plaintiffs' motion for summary judgment and have, themselves, moved for summary judgment.

## BACKGROUND

On November 20, 2001, Cape Wind submitted an application to the Corps for a permit under section 10 to construct and operate a data tower in an area of Nantucket Sound known as Horseshoe Shoals.[8] (Horseshoe Shoals is located on the OCS, which is subject to federal jurisdiction and control.[9]) The data tower, upon its completion, will consist of a fixed, monopole structure with an overall height of approximately 197 feet.[10] The monopole structure will be supported by three, thirty-six-inch in diameter, open-ended steel piles that will be driven beneath the ocean floor, and it will have three levels of instrumenta-

Osterville Anglers Club, Inc.; and Hyannis Anglers Club, Inc.

3. The other named Defendants are: United States Department of the Army; Honorable Thomas E. White, Secretary of the Army; Lt. General Robert B. Flowers, Chief of Engineers, United States Army Corps of Engineers; and Colonel Thomas L. Koning, District Engineer, United States Army Corps of Engineers.

4. On November 4, 2002, this court granted Cape Wind's motion to intervene in the action between Plaintiffs and Defendants.

5. 33 U.S.C. § 403.

6. "The term '[O]uter Continental Shelf' means all submerged lands lying seaward and outside of the area of lands beneath navigable waters …, and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control[.]" 43 U.S.C. § 1331(a). The term "lands beneath navigable waters" is defined as "all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographic miles distant from the coast line of each [of the respective] State[s] …." 43 U.S.C. § 1301(a)(2).

7. 42 U.S.C. §§ 4331–32.

8. Administrative R. at 103–05. In submitting the application, Cape Wind affirmed, by the signature of its agent, that it possessed, or that it would possess, the property rights it needed to move forward with the data tower project at the proposed location. *See* 33 C.F.R. § 325.1(d)(7) ("The signature of the applicant or the agent will be an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application ….").

9. *See* 43 U.S.C. § 1331(a).

10. Administrative R. at 1436.

tion.[11] The three steel piles will also support a platform set about thirty-three feet above mean low water in waters that are approximately thirteen feet deep.[12] An Acoustic Doppler Current Profiler ("ADCP") is to be mounted on the seabed in close proximity to the tower.[13] A wire will connect the ADCP to the data tower.[14] The wire will be buried beneath the ocean floor.[15] The entire data tower project will "cover[ ] an area of ocean waters of approximately 900 sq[uare] f[ee]t." [16]

On November 21, 2002, Cape Wind submitted a separate application to the Corps for a section 10 permit to construct and operate a wind energy plant on Horseshoe Shoals.[17] The application describes the wind energy plant as consisting of 170 wind turbine generators on a grid covering approximately twenty-six square miles of the Sound.[18] Each wind turbine will be 263 feet in height and will be fitted with three blade rotors (160 feet in length) that will, themselves, reach a maximum height of 423 feet.[19] The turbines will be placed on monopole foundations that will be driven beneath the ocean floor.[20]

On December 4, 2001, the Corps announced to the public that it was considering Cape Wind's data tower application.[21]

(The announcement stated that the wind energy plant project would be "the subject of a separate and distinct ... review process with further opportunity for public involvement." [22]) At that time, the Corps invited the public to comment on the data tower application, and it set January 4, 2002 as the deadline for the public comment period.[23] In response to requests for additional time for public comment, the Corps subsequently extended the comment period on more than one occasion.[24] The public comment period eventually came to a close on May 13, 2002.[25]

In addition to inviting the public to comment during the above mentioned period, the Corps held public hearings in Hyannis, Massachusetts and Martha's Vineyard, Massachusetts on April 11, 2002 and April 18, 2002, respectively.[26] The hearings were intended to provide an opportunity for interested groups and individuals to comment on the data tower application.

The comment period and hearings generated a considerable response from federal and state agencies and the general public. As one might expect, the administrative record contains comments both in

---

11. *Id.* at 2903.

12. *Id.*

13. *Id.* at 1436.

14. *Id.* at 2593.

15. *Id.*

16. *Id.*

17. Olmsted Aff. ¶ 2. To be sure, the data tower will provide Cape Wind with information that will help it determine the feasibility of locating the wind energy plant in the area of Nantucket Sound in question. Administrative R. at 2593. But, it will also provide information that is useful for other purposes, includ-

ing scientific research and education. *See id.* at 2587.

18. Olmsted Aff. Ex. B.

19. *Id.*

20. Olmsted Aff. Ex. A.

21. Administrative R. at 106–07.

22. *Id.* at 106.

23. *Id.*

24. *Id.* at 2597.

25. *Id.*

26. *Id.*

opposition to [27] and in support of the data tower project.

On August 19, 2002, after nine months of review, the Corps issued a section 10 permit to Cape Wind that authorized it to move forward with the data tower project, subject to certain conditions set forth in the permit.[28] Among those conditions are the following: Cape Wind must remove the data tower "within five years of the start of construction," [29] Cape Wind must "post a bond for $300,000 . . . for emergency repairs or removal of the tower," [30] and Cape Wind must share the data it collects with government agencies, educational institutions, and research organizations.[31]

In addition to the permit, the Corps issued an Environmental Assessment ("EA") and a Finding of No Significant Impact ("FONSI") pursuant to NEPA requirements.[32] (It did not, however, make those documents available for public comment.)

A few words about the purposes of and the legal framework that surrounds NEPA are in order. NEPA was enacted in recognition of "the profound impact of man's activity on . . . the natural environment . . . ." [33] It was promulgated to ensure that federal agencies consider the potential environmental consequences of proposed projects before allowing them to proceed.[34] Toward this end, it provides "a set of 'action-forcing' procedures that require that agencies take a 'hard look at environmental consequences . . . .' " [35] Although NEPA imposes a series of "action-forcing" procedural requirements on federal agencies, it "does not mandate particular results." [36] As long as "the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." [37]

As a means to ensure that federal agencies take the requisite "hard look" at the environmental impacts of proposed actions, NEPA requires that a federal agency prepare a "detailed statement" (which is known as an environmental impact statement ("EIS")) whenever it proposes a "major Federal action[ ] significantly affecting the quality of the human environment." [38] The EIS should provide a detailed discussion of, among other things, "the environmental impact of the proposed

27. The ensuing comments, which were made in opposition to the data tower project, are among those that appear in the administrative record: (1) the Corps lacks the authority to issue a section 10 permit to develop OCS lands in the manner that Cape Wind proposed, *id.* at 2154–55, (2) it is not possible for Cape Wind to obtain the property rights that it needs in the OCS land that it seeks to develop to obtain a section 10 permit, *id.* at 1882, 1887–88, 2455–56, and (3) the Corps acted improperly in considering the data tower project separately from the wind energy plant project in its section 10 review process, *id.* at 1908–09, 2156–57.

28. *Id.* at 2583–88.

29. *Id.* at 2603.

30. *Id.* at 2586.

31. *Id.* at 2587.

32. *Id.* at 2593–2607.

33. 42 U.S.C. § 4331(a).

34. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

35. *Id.* at 350, 109 S.Ct. 1835 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)).

36. *Id.*

37. *Id.*

38. 42 U.S.C. § 4332(C).

action" and "alternatives to the proposed action."[39]

NEPA also established the Council on Environmental Quality ("CEQ") to help further the statute's environmental objectives, and it authorized the CEQ to enact regulations describing environmental review procedures that federal agencies are to follow to comply with NEPA.[40] Pursuant to this power, the CEQ "has promulgated detailed regulations setting forth when a federal agency must prepare a full [EIS] or the less extensive [EA and FONSI] and what must be included in each."[41] It is, thus, clear that not every proposed action requires the preparation of an EIS.

Indeed, according to CEQ regulations, an agency may comply with NEPA by preparing an EA and a FONSI if it finds that a proposed action "will not have a significant effect on the human environment ...."[42] An EA is a "concise ... document" that serves to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]."[43] It includes "brief discussions of the need for the proposal, of alternatives ..., [and] of the environmental impacts of the proposed action and alternatives ...."[44]

A FONSI is a "brief[ ]" document that "present[s] the reasons why an action ... will not have a significant effect on the human environment ...."[45] The FONSI "include[s] the [EA] or a summary of it and ... note[s] any other environmental documents related to it ...."[46]

Subsequent to the Corps' decision to issue the section 10 permit, Plaintiffs brought this action challenging that decision. Presently before this court are Plaintiffs, Defendants, and Intervenor's motions for summary judgment. Plaintiffs argue that, for the reasons that are recounted below, the Corps acted unlawfully in issuing Cape Wind a section 10 permit for the data tower project. Defendants and Intervenor maintain that the Corps did not, in any way, act wrongfully in granting Cape Wind the section 10 permit.

## DISCUSSION

The parties have filed motions for summary judgment. Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if the record reveals that there is "no genuine issue as to any material fact and ... the moving party [has] demonstrated an] entitle[ment] to a judgment as a matter of law."[47] Pursuant to this standard, the "party seeking summary judgment [must] make a preliminary showing that no genuine issue of material

---

**39.** 42 U.S.C. § 4332(C)(i), (iii).

**40.** *See* 42 U.S.C. §§ 4342, 4344.

**41.** *City of Waltham v. United States Postal Serv.*, 786 F.Supp. 105, 113 (D.Mass.1992); *see, e.g.,* 40 C.F.R. §§ 1501.3, 1501.4, 1502.1, 1502.2, 1502.14, 1508.9, 1508.11, 1508.13.

**42.** 40 C.F.R. § 1508.13; *see* 40 C.F.R. §§ 1501.3, 1501.4, 1508.9.

**43.** 40 C.F.R. § 1508.9(a)(1).

**44.** 40 C.F.R. § 1508.9(b).

**45.** 40 C.F.R. § 1508.13; *see* 40 C.F.R. § 1508.27 (listing criteria for determining the significance of environmental impacts).

**46.** 40 C.F.R. § 1508.13.

**47.** Fed.R.Civ.P. 56(c). "In the lexicon of Rule 56, 'genuine' connotes that the evidence on the point is such that a reasonable jury, drawing favorable inferences, could resolve the fact in the manner urged by the nonmoving party, and 'material' connotes that a contested fact has the potential to alter the outcome of the suit under the governing law if the controversy over it is resolved satisfactorily to the nonmovant." *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996).

fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue."[48]

Of course, "[t]he happenstance that all parties seek summary judgment neither alters the yardstick nor empowers the trial court to resolve authentic disputes anent material facts."[49] A court considering cross-motions for summary judgment "must evaluate each motion separately, being careful to draw inferences against each movant in turn."[50]

It will be helpful at the outset to examine both the standard that this court must use to review an agency's actions as well as the scope of this court's review of such actions. The standard of review set forth in the Administrative Procedure Act ("APA") applies to judicial review of a federal agency's decisions.[51] Under the APA, a decision of an agency will be set aside only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[52] The party challenging an agency's decision "bears the burden of establishing that the [a]gency acted arbitrarily or capriciously or otherwise abused its discretion."[53]

The standard of review under the APA "accords great deference to agency decision-making . . . ."[54] Indeed, "[i]n applying the arbitrary and capricious standard, the task of the reviewing court is to determine whether the agency considered the pertinent evidence and relative factors and sufficiently articulated an explanation for its action."[55] Assuming that the agency's determination is "within the bounds of reasoned decisionmaking," it may not be set aside.[56] A reviewing court is not to substitute its judgment for that of the agency.

■ An agency's interpretation of a statute it is charged with administering is, accordingly, entitled to deference. If the intent of Congress is not clear from the face of a statute, an agency's construction of such a statute should be upheld so long as it is reasonable.[57] If, however, the intent of Congress is clear from the face of the statute, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[58]

An agency's interpretation of its own regulations is entitled to an even higher

48. *Id.* (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995), *cert. denied*, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995)).

49. *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990).

50. *Id.*

51. *See, e.g., Town of Norfolk v. United States Corps of Eng'rs*, 968 F.2d 1438, 1445–46 (1st Cir.1992).

52. *E.g., id.* (quoting 5 U.S.C. § 706(2)(A)).

53. *The M/V Cape Ann v. United States*, 199 F.3d 61, 63 (1st Cir.1999).

54. *N. Wind, Inc. v. Daley*, 200 F.3d 13, 17 (1st Cir.1999).

55. *The M/V Cape Ann*, 199 F.3d at 63.

56. *Id.* at 63–64.

57. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Town of Norfolk v. United States Corps of Eng'rs*, 968 F.2d 1438, 1446 (1st Cir.1992) ("An agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress.") (quoting *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985)).

58. *Chevron, U.S.A., Inc.*, 467 U.S. at 843, 104 S.Ct. 2778.

degree of deference than that which is afforded to an agency's interpretation of a statute that it is charged with enforcing.[59] That is, "provided [that] an agency's interpretation of its own regulation does not violate the Constitution or a federal statute, it must be given controlling weight unless it is *plainly erroneous* or inconsistent with the regulation.' " [60]

In terms of the scope of judicial review of agency action, the APA provides that a reviewing court should use only the record in existence at the time the agency made its decision to determine whether the agency acted lawfully. Indeed, as the Supreme Court has emphasized:

> "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." The task of the reviewing court is to apply the appropriate APA standard of review ... to the agency decision based on the record the agency presents to the reviewing court.[61]

## A. Section 10

Plaintiffs argue that the Corps lacked the authority to issue a section 10 permit for the construction of the data tower on the OCS. This court disagrees.

By way of background, it is useful to review the Corps' jurisdiction to issue section 10 permits for activities on the OCS. Section 10 provides in relevant part:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any ... structures in any ... water of the United States ..., except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army .... [62]

Over the years, the body of law surrounding section 10 has evolved in such a way that, today, "a permit from the ... Corps ... is required for the installation of any structure in the navigable waters" of the United States.[63]

Typically, "[t]he navigable waters of the United States over which [the] Corps['] ... regulatory jurisdiction extends" includes only those ocean and coastal waters that can be found up to three geographic miles seaward of the coast.[64] On the OCS, however, the Corps' regulatory jurisdiction extends beyond that three-mile limit.[65]

The Outer Continental Shelf Lands Act ("OCSLA") extends the Corps' section 10

---

**59.** *See Visiting Nurse Ass'n of N. Shore, Inc. v. Bullen,* 93 F.3d 997, 1002 (1st Cir.1996).

**60.** *Id.* (quoting *Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (citation omitted) (emphasis in original)).

**61.** *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (quoting *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (citation omitted)).

**62.** 33 U.S.C. § 403.

**63.** *PUD No. 1 of Jefferson County v. Washington Dep't of Ecology,* 511 U.S. 700, 722, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994); *see* 33 C.F.R. § 325.8(a) ("[T]he Secretary of the Army ... has authorized the Chief of Engineers and his authorized representatives to issue or deny permits ... for construction or other work in or affecting navigable waters of the United States pursuant to section 10 ...."). Corps regulations define the "[n]avigable waters of the United States" as "those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." 33 C.F.R. § 329.4.

**64.** 33 C.F.R. § 329.12(a).

**65.** *See id.;* 43 U.S.C. § 1333(a)(1), (e).

authority to the OCS.[66] As it was originally drafted, section 4(f) of the OCSLA (which is now codified as 43 U.S.C. § 1333(e)) gave the Corps authority over "the artificial islands and fixed structures" on the OCS: "The authority of the [Corps] to prevent obstruction to navigation in the navigable waters of the United States is hereby extended to the artificial islands and fixed structures located on the [OCS]."[67] This original grant of authority to the Corps under section 4(f) of the OCSLA was quite broad.[68]

In 1978, Congress amended the OCSLA, including the portion detailing the Corps' regulatory authority over OCS lands. In its present form, section 1333(e) (which was formerly section 4(f) of the OCSLA) provides that the Corps' "authority ... to prevent obstruction to navigation in the navigable waters of the United States ... extend[s] to the artificial islands, installations, and other devices referred to in" 43 U.S.C. § 1333(a).[69] Section 1333(a) declares:

> The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the [OCS] and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or

vessel) for the purpose of transporting such resources .... [70]

Of predominant importance to this litigation is the reality that the 1978 amendments to the OCSLA were not intended to alter the Corps' jurisdiction over the OCS. The legislative history of those amendments makes it very clear that Congress, in amending what is now section 1333(e), intended only to revise the former version's reference to "fixed structures." The revision was intended to make that section conform to the broader reference to "all installations and other devices permanently or temporarily attached to the seabed" that appears in what is now section 1333(a). In other words, as the following excerpt from the legislative history of the 1978 amendments demonstrates, Congress, in amending the OCSLA, did not intend to in any way limit the Corps' regulatory authority:

> [T]he[ 1978] changes were technical only and there was no intent to change present law.

> The existing authority of the Corps of Engineers, in subsection 4(f), applies to all artificial islands and fixed structures on the [OCS], whether or not they are erected for the purpose of exploring for, developing, removing, and transporting resources therefrom. The amendment to subsection 4(f) is not intended to change the scope of this authority, but merely to conform the description of the types of structures, no matter what their

---

66. *See* 43 U.S.C. § 1333(a)(1), (e).

67. 43 U.S.C. § 1333(f) (1958) (current version at 43 U.S.C. § 1333(e)).

68. *See United States v. Ray*, 294 F.Supp. 532, 534, 541 (S.D.Fla.1969), *aff'd in part and rev'd in part*, 423 F.2d 16 (5th Cir.1970) (holding that a section 10 permit from the Corps was a prerequisite to the construction of an artificial "island nation" on OCS lands); H.R. Conf.

Rep. No. 95–1474, at 81 (1978), *reprinted in* 1978 U.S.C.C.A.N. 1674, 1680 (noting that section 4(f) "has been used by the Corps ... to regulate the construction and location of such things as artificial fishing reefs, radio towers, and a proposed gambling casino which was to be constructed on reefs").

69. 43 U.S.C. § 1333(e).

70. 43 U.S.C. § 1333(a)(1).

purpose, to the types of structures listed in subsection (a), namely all installations and other devices permanently or temporarily attached to the seabed. It is not the intention of the conferees to limit the authority of the Corps of Engineers as to structures used for the exploration, development, removal, and transportation of resources.[71]

It is also significant to note that, since Congress amended the OCSLA, the Corps has consistently interpreted section 1333(e) as giving it section 10 jurisdiction over all "artificial islands, installations, and other devices located on the seabed, to the seaward limit of the [OCS]," regardless of whether they are erected for the purpose of extracting resources.[72]

In light of this background, this court now turns its attention to the issue of whether the Corps had the authority to issue a section 10 permit for the data tower. Plaintiffs argue that the Corps lacked the authority to issue the permit in question because Congress, in amending the OCSLA in 1978, restricted the sweeping authority that it had previously granted to the Corps to issue section 10 permits for activities on the OCS.[73] Plaintiffs' theory is that the Corps presently has section 10 jurisdiction on the OCS only over those structures erected for the purpose of extracting resources.[74] Because the data tower was not erected for the purpose of extracting resources,[75] Plaintiffs assert that the Corps lacked the authority to issue the permit and, therefore, that the issuance of the permit was beyond the bounds of reasoned decisionmaking. The Corps, however, maintains that the 1978 amendments to the OCSLA did not limit its jurisdiction to issue section 10 permits and, thus, that the issuance in this case was reasonable.

In evaluating an agency's interpretation of a congressional statute, this court must first determine "whether Congress has directly spoken to the precise question at issue." [76] If it has, this court must give effect to that institution's expressed intent.[77] If Congress has not "directly spoken to the precise question at issue," then this court must defer to the agency's interpretation so long as that interpretation is

---

**71.** H.R. Conf. Rep. No. 95–1474, at 82 (1978), *reprinted in* 1978 U.S.C.C.A.N. 1674, 1681. "The conference report is generally the most reliable evidence in legislative history of congressional intent because it represents the final statement of the terms agreed to by both houses." *E.g., Auburn Hous. Auth. v. Martinez,* 277 F.3d 138, 147 (2d Cir.2002).

**72.** 33 C.F.R. § 320.2(b); *see also* 33 C.F.R. § 322.3(b) (same); 33 C.F.R. § 322.5(f) (same).

**73.** Pls.' Br. at 8–11.

**74.** *Id.* at 10. Plaintiffs base their argument on a close reading of the OCSLA, which refers to "all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon *for the purpose of exploring for, developing, or producing resources therefrom,* or

any such installation or other device (other than a ship or vessel) *for the purpose of transporting such resources* ...." 43 U.S.C. § 1333(a)(1) (emphasis added). Plaintiffs read this provision as restricting the jurisdiction of the Corps to installations and devices that are used to extract resources from the seabed. Pls.' Br. at 10.

**75.** Administrative R. at 2593 (The data tower was designed "to provide site specific meteorological and oceanographic data [that Cape Wind] believe[s] will be useful for the effective and efficient design[ ] and construction of a proposed commercial ... offshore wind [energy] project.").

**76.** *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**77.** *Id.*

reasonable.[78] The Plaintiffs' (and, even, this court's) view of the "best" reading of the statute is wholly irrelevant.

■ Here, Congress has, in fact, "directly spoken to the precise question at issue." As this court has already noted, the Corps currently interprets section 1333(e) as extending its section 10 authority to all "artificial islands, installations, and other devices located on the seabed, to the seaward limit of the [OCS]."[79] That provision of the OCSLA unequivocally states that "[t]he authority of the [Corps] to prevent obstruction to navigation in the navigable waters of the United States is hereby extended to the artificial islands, installations, and other devices referred to in" section 1333(a).[80] Section 1333(a) refers to "*all* artificial islands, and *all* installations and other devices permanently or temporarily attached to the seabed, which *may be* erected thereon for the purpose of exploring for, developing, or producing re-

sources therefrom ...."[81] The relevant provisions of the OCSLA support the Corps' assertion that its section 10 authority extends to all "artificial islands, installations, and other devices located on the seabed, to the seaward limit of the [OCS],"[82] including, but not limited to, those that "*may be*" used to explore for, develop, or produce resources.[83]

. What is more, in the conference report that accompanied the 1978 amendments, Congress confirmed that, in adopting the amendments, it did not intend to "limit the authority of the Corps of Engineers as to structures used for the exploration, development, removal, and transportation of resources."[84] Congress has, thus, made crystal clear its intention that the Corps exert jurisdiction over both extractive and non-extractive structures on the OCS.

Legislative history can, of course, be consulted to confirm congressional intent on a particular question.[85] Indeed, the

---

78. *See id.*

79. *See* 33 C.F.R. § 320.2(b).

80. 43 U.S.C. § 1333(e).

81. 43 U.S.C. § 1333(a)(1) (emphasis added).

82. 33 C.F.R. § 320.2(b).

83. 43 U.S.C. § 1333(a)(1) (emphasis added). Plaintiffs also ignore the fact that the 1978 amendments to the OCSLA did not materially amend the key modifying phrase in section 1333(a) that is at issue in this case: "which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom ...." 43 U.S.C. § 1333(a)(1). Before Congress amended the OCSLA in 1978, that key modifying phrase read as follows: "which may be erected thereon for the purpose of exploring for, developing, removing, and transporting resources therefrom ...." 43 U.S.C. § 1333(a)(1) (1958) (current version at 43 U.S.C. § 1333(a)(1)). It is, therefore, the case that if the Corps had the authority to issue a permit for the placement of a structure unrelated to mineral extraction on the OCS prior

to 1978 (and both parties agree that it had that authority), then the 1978 amendments should have had no effect on that power.

84. H.R. Conf. Rep. No. 95–1474, at 82 (1978), *reprinted in* 1978 U.S.C.C.A.N. 1674, 1681.

85. *See, e.g., Nat'l Rifle Ass'n of Am., Inc. v. Reno,* 216 F.3d 122, 127 (D.C.Cir.2000) (noting that, in determining "whether Congress has directly spoken to the precise question at issue," a court "must ... 'exhaust the traditional tools of statutory construction,' ... and may examine the statute's legislative history in order to 'shed new light on congressional intent, notwithstanding statutory language that appears superficially clear'") (quoting *Natural Res. Def. Council, Inc. v. Browner,* 57 F.3d 1122, 1125, 1127 (D.C.Cir.1995)); *Goncalves v. Reno,* 144 F.3d 110, 128 (1st Cir. 1998) (recognizing that a court, in an effort to determine congressional intent, may "examine ... legislative history, not as a substitute for examination of [the statute's] text, but only as a check to see that [the court's] initial textual interpretation does not conflict with 'a clearly expressed legislative intention con-

Supreme Court has declared that "[i]f a court, *employing traditional tools of statutory construction,* ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." [86]

■ Even if this court were to find the relevant sections of the OCSLA unclear or ambiguous, it would nevertheless defer to the Corps' interpretation because it is reasonable. The Corps' interpretation is reasonable not only because it is consistent with the text of the OCSLA and the OCSLA's legislative history, but also because it is consistent with the overall purposes of the OCSLA. In broadly exercising section 10 authority over proposed development of the OCS, the Corps facilitates the realization of one of the OCSLA's underlying goals: to make the OCS "available for expeditious and orderly development" that is "subject to environmental safeguards . . . ." [87]

■ Plaintiffs argue that the Corps' interpretation of its own authority under section 10 and the OCSLA is not entitled to the degree of deference alluded to in the preceding text (that is, "*Chevron* deference") because the Department of the Interior, and not the Corps, is the "agency

vested by the [OCSLA] with primary responsibility over regulation of commercial activity on the OCS." [88] This court disagrees.

In *United States v. Mead Corp.,* the Supreme Court held "that administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." [89] This case involves only the federal government's section 10 authority on the OCS. And, in *United States v. Alaska,* the Supreme Court recognized the vast scope of the Corps' rulemaking authority under section 10. [90] (The Corps, incidentally, does not share that authority with any other agency.) Congress, moreover, has confirmed that the Corps' section 10 authority extends to "all installations and other devices permanently or temporarily attached to the seabed" of the OCS. [91] And, finally, the Corps, pursuant to its section 10 authority, has adopted regulations that govern projects on the seabed "to the seaward limit of the [OCS]." [92] In view of all of the above, this court finds

trary to the statutory language which would require the court to question the strong presumption that Congress expresses its intent through the language it chooses' ") (citation omitted), *cert. denied,* 526 U.S. 1004, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999).

86. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (emphasis added).

87. 43 U.S.C. § 1332(3); *see* 33 C.F.R § 320.4(a)(1) (providing that, in section 10 permit proceedings, the Corps should consider, among other things, environmental factors). If this Court were to subscribe to the Plaintiffs' view that the Corps lacks the power under the OCSLA to regulate non-extractive

structures on the OCS, then no agency would have the power to regulate such structures on the OCS. Congress could not have intended to create such a regulatory void when it amended the OCSLA in 1978.

88. Pls.' Opp'n Br. at 6 n. 3.

89. 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

90. 503 U.S. 569, 576–83, 112 S.Ct. 1606, 118 L.Ed.2d 222 (1992).

91. 43 U.S.C. § 1333(a)(1); *see* 43 U.S.C. § 1333(e).

92. 33 C.F.R. § 320.2(b).

that the Corps is entitled to *Chevron* deference in its interpretation of the scope of its section 10 authority on the OCS.

## B. *Property Interest*

 Plaintiffs contend that the Corps, pursuant to its own regulations, should have denied Cape Wind's data tower permit application because Cape Wind does not currently possess, and will not possess in the future, the required property interest to construct the data tower at the specified location on the OCS. They maintain that Corps regulations "require that an applicant have sufficient property rights as a prerequisite for a permit."[93] The same argument was made to the Corps before it issued the permit.[94] The Corps, however, insisted that the argument was based on a fundamental misinterpretation of Corps regulations. And, in its review of the data tower permit application, the Corps, acting in accordance with its own interpretation of what Corps regulations require, opted not to formally address the property interest issue.[95] Not only does this court find that the Corps' interpretation of its regulations was reasonable, but it also agrees with the Corps that Plaintiffs are wrong in their belief that Corps regulations "require that an applicant have sufficient property rights as a prerequisite for a permit."

The regulations upon which the Plaintiffs base their argument provide the following:

A [Corps] permit does not convey any property rights, either in real estate or material, or any exclusive privileges. Furthermore, a [Corps] permit does not authorize any injury to property or invasion of rights or any infringement of Federal, state or local laws or regulations. The applicant's signature on an application is an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application. The [Corps] will not enter into disputes but will remind the applicant of the above. The dispute over property ownership will not be a factor in the Corps['] public interest decision.[96]

Corps regulations, thus, require only that a permit applicant "*affirm* [ ] that the applicant possesses or will possess the requisite property interest to undertake" its proposed activity.[97] Cape Wind provided that affirmation,[98] and Corps regulations require nothing more. Despite Plaintiffs' contentions, it is quite apparent that the regulations in issue do not aim to involve the Corps in property disputes.[99] Rather, they are a part of a scheme designed to keep the Corps out of property disputes. It is, therefore, the case that even if the Corps had doubted the sufficiency of Cape

93. Pls.' Br. at 11.

94. Administrative R. at 2455–56.

95. *See id.* at 2605 ("[O]ur regulations ... provide that the Corps should not enter into property disputes but should remind the applicant that the applicant's signature on the application is an affirmation that the applicant possesses the requisite property interest to undertake the proposed activity.").

96. 33 C.F.R. § 320.4(g)(6); *see also* 33 C.F.R. § 325.1(d)(7) ("The signature of the applicant or [a duly authorized] agent [on the permit application] will be an affirmation that the

applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application ....").

97. 33 C.F.R. § 320.4(g)(6) (emphasis added).

98. *See* Administrative R. at 104–12.

99. *See* 33 C.F.R. § 320.4(g)(6) ("The district engineer will not enter into [property] disputes .... The dispute over property ownership will not be a factor in the Corps['] public interest decision.").

Wind's property interest in the OCS lands in issue, it would not have had the authority to consider Plaintiffs' property interest argument in its review of the data tower permit application.

■ An agency's construction of its own regulations is, of course, entitled to substantial deference.[100] The Corps interpreted its regulations as requiring only that Cape Wind provide an "*affirmation* that [it] possesses or will possess the requisite property interest" to construct the data tower.[101] Because the Corps' decision not to enter into the property dispute in which Plaintiffs and Cape Wind were engaged was entirely consistent with its regulations (and, given the circumstances, because it was the only reasonable decision that the Corps could have made), its grant of a permit for the data tower must be upheld.

## C. *NEPA*

Plaintiffs allege that the Corps failed to comply with NEPA in the following ways: (1) it did not circulate the EA and FONSI for public comment, (2) it did not adequately consider alternatives to the data tower, (3) it acted improperly in reviewing the data tower application apart from the wind energy plant application, and (4) it did not consider the environmental effects of removal of the data tower.

In analyzing Plaintiffs' contentions, it is useful to review precisely what the Corps' data tower permit sanctioned. The permit granted Cape Wind the right to locate and operate a data tower, which consists of three pilings that support a steel pole and platform, and an ADCP on the OCS in Nantucket Sound. The permit provides for and regulates both the placement and removal of the tower and ADCP. Significantly, the permit does not grant Cape Wind the right to construct a wind energy plant. Cape Wind's wind energy plant application is the subject of a separate environmental review.[102]

### 1. *Circulation of the EA and FONSI for Public Comment*

Plaintiffs claim that the Corps violated NEPA in deciding not to circulate the EA and FONSI for public comment. This court disagrees.

CEQ regulations provide that, "[i]n certain limited circumstances, ... the agency shall make the [FONSI] available for public review ... for 30 days before the agency makes its final determination whether to prepare an [EIS] and before the action may begin." [103] One of those "limited circumstances" (and the "limited circumstance[ ]" to which the Plaintiffs draw this court's attention) is when "[t]he nature of the proposed action is one without precedent." [104]

Plaintiffs claim that the data tower project is "without precedent" because "[n]o precedent exists for [Cape Wind's] two-phase scheme, starting with the data tower and moving to full project development," its "wind energy facilities on the OCS, or [its] rel[iance] on section 10 for that purpose." [105] These allegedly unprecedented features relate to the wind energy project (and not to the data tower project) and are, therefore, irrelevant to this action. The Corps reasonably determined that there is nothing unprecedented about the

---

**100.** *See Visiting Nurse Ass'n of N. Shore, Inc. v. Bullen,* 93 F.3d 997, 1002 (1st Cir.1996).

**101.** 33 C.F.R. § 320.4(g)(6) (emphasis added).

**102.** Administrative R. at 2597–98, 2601.

**103.** 40 C.F.R. § 1501.4(e)(2).

**104.** 40 C.F.R. § 1501.4(e)(2)(ii).

**105.** Pls.' Br. at 15–16.

data tower project.[106] After all, it consists of only two temporary components, a monopole structure and an ADCP. And, not only did the Corps conclude that "[a] similar ... structure has been authorized off Martha's Vineyard," [107] but it also found that the data tower was comparable to a number of similarly-constructed, pile-supported piers along the coast.[108] These findings, which are eminently reasonable, are entitled to deference.

As a general rule, moreover, Corps regulations, which supplement CEQ regulations, do not require the circulation of an EA for public comment. Rather, they "require the public comment period to be completed prior to the EA's issuance." [109]

██ Corps regulations do "apply [a] thirty-day public comment requirement to draft FONSIs and EAs 'in the case of feasibility, continuing authority, or special planning reports and certain planning/engineering reports.' " [110] Yet, as agency regulations reveal, "[t]hese reports ... are distinct from Corps decisions on permit applications like the one in this case." [111]

The Corps, therefore, did not act unreasonably in deciding not to circulate a draft FONSI or EA.

## 2. Analysis of Alternatives to the Data Tower

Plaintiffs claim that the EA is flawed because the Corps was deficient in its analysis of alternatives to the data tower project. Plaintiffs' claim is without merit.

CEQ regulations provide that, in order for an EA to comply with NEPA, it must "include *brief* discussions ... of alternatives [and] of the environmental impacts of the ... alternatives ...." [112] The EA in issue satisfied these requirements. First, as Plaintiffs concede,[113] the Corps evaluated a sufficient range of alternatives to the data tower, including: (1) land-based alternatives, (2) Sonic Detection and Ranging ("SODAR") technology, (3) existing data sets, and (4) alternative offshore locations and tower designs.[114] And, second, after the Corps rejected land-based alternatives, SODAR technology, and existing data sets

106. Administrative R. at 2606.

107. *Id.* Plaintiffs argue that the Corps should not be allowed to cite to the existence of the tower off Martha's Vineyard to support its permit decision in this case because the Martha's Vineyard tower is located in state waters (and not on OCS lands) and is being built by a public entity for benevolent purposes (rather than a private entity for private purposes). Pls.' Br. at 16. From an environmental perspective, however, these differences are irrelevant. Neither the location nor the nature of ownership of Cape Wind's data tower render its environmental impacts different from those of the Martha's Vineyard tower. And, of course, NEPA was enacted in recognition of "the profound impact of man's activity on ... the national environment" and to ensure that federal agencies consider the potential environmental impacts of projects before allowing them to move forward. 42 U.S.C. § 4331(a).

108. Administrative R. at 2594.

109. *Pogliani v. United States Army Corps of Eng'rs,* 306 F.3d 1235, 1238 (2d Cir.2002); *see* 33 C.F.R. § 325, app. B ¶ 7 ("The district engineer should complete an EA as soon as practicable after all relevant information is available (i.e., after the comment period for the public notice of the permit application has expired) ....").

110. *Pogliani,* 306 F.3d at 1238 (quoting 33 C.F.R. § 230.11).

111. *Id.* at 1239.

112. 40 C.F.R. § 1508.9(b) (emphasis added); *see also* 33 C.F.R. § 230.10(b), (c) (noting that an EA "is to be concise" and "normally should not exceed 15 pages").

113. Pls.' Opp'n Br. at 19.

114. Administrative R. at 2594–96.

on the ground that these alternatives would not provide Cape Wind with the information that it desired,[115] it considered the environmental impacts associated with the remaining alternatives.[116] In the end, the Corps found the data tower proposal to be the "least impact alternative." [117] The Corps' treatment of project alternatives was reasonable.

### 3. Consideration of the Data Tower Application Separately From the Wind Energy Plant Application

Plaintiffs assert, incorrectly, that the Corps was wrong to consider the data tower project separately from the wind energy plant project. CEQ regulations require that two projects be considered together in the same EA or EIS if they constitute "[c]onnected actions" or "[c]umulative actions." [118] Connected actions "[a]utomatically trigger other actions which may require [EISs] ... [, c]annot or will not proceed unless other actions are taken previously or simultaneously ... [, or a]re interdependent parts of a larger action and depend on the larger action for their justification." [119] Cumulative actions are actions that, "when viewed with other proposed actions[,] have cumulatively significant impacts." [120]

■ The data tower project does not qualify as an action that is "[c]onnected" to the wind energy plant proposal under any of the above definitions. First, the authorization of the data tower project does not "automatically trigger" the authorization of

---

115. *Id.*

116. *Id.* (recognizing that alternative offshore locations and tower designs had the potential to cause greater environmental impacts than Cape Wind's data tower proposal).

117. *Id.* at 2596.

118. 40 C.F.R. § 1508.25(a)(1), (2); *see Wetlands Action Network v. United States Army Corps of Eng'rs*, 222 F.3d 1105, 1118 (9th Cir.2000) ("The [CEQ] regulations implementing NEPA require that an agency consider 'connected actions' and 'cumulative actions' within a single EA or EIS."). An agency, however, has a degree of discretion with regard to whether to analyze "[s]imilar actions" (actions that "have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography") in the same impact statement. 40 C.F.R. § 1508.25(a)(3) ("An agency *may wish* to analyze these actions in the same impact statement.") (emphasis added). To be sure, an agency *"should* [analyze similar actions in the same impact statement] when the best way to assess adequately the combined impacts of similar actions ... is to treat them in the same impact statement." 40 C.F.R. § 1508.25(a)(3) (emphasis added). But, Plaintiffs have not pointed to any record evidence that indicates that "the best way to assess adequately the combined impacts" of the data tower project and wind energy plant project "is to treat them in the same impact statement." 40 C.F.R. § 1508.25(a)(3). What is more, this court is not convinced that the two projects constitute similar actions. After all, Cape Wind plans to study the information it collects from the data tower before moving forward with the wind energy plant project. *See* Administrative R. at 2601. And, there is no guarantee that Cape Wind will opt to construct the wind energy plant in the area of Nantucket Sound in question or that the Corps will grant Cape Wind a permit for such construction. *Cf. South Carolina v. O'Leary*, 64 F.3d 892, 899 (4th Cir.1995) (reasoning that two shipments of spent nuclear fuel rods for storage did not constitute similar actions: "The timing of the shipments is different, since the [first] shipments are scheduled to conclude within the next few months and the [second] shipments will not begin for several years, if ever. Moreover, since a site for the [second storage] facility has not been selected, it may be constructed at an entirely different [location].").

119. 40 C.F.R. § 1508.25(a)(1)(i), (ii), (iii).

120. 40 C.F.R. at § 1508.25(a)(2).

the wind energy plant project.[121] Second, the information from the data tower "is not required for the wind power project ... but may be used if available and relevant." [122] And, third, the data tower project's utility does not depend on the ultimate authorization of the wind energy plant project.[123]

The data tower project and the wind energy plant project also do not qualify as "[c]umulative actions." Although Plaintiffs claim that the data tower and wind energy plant permit applications should have been considered together, they do not point to any evidence in the administrative record that suggests that the temporary placement of the data tower and ADCP on the seabed will have an environmental impact

that is significant when it is considered alongside the wind energy plant proposal. It is, therefore, the case that the Corps did not act wrongfully in considering the two permit applications separately from one another.

This court, moreover, finds it significant that the Corps did not in any way seek to avoid its NEPA requirements in considering the data tower application apart from the wind energy plant application.[124] Although the Corps opted to issue an EA and FONSI (rather than an EIS) for the data tower project, it is in the process of performing an EIS on the proposed wind energy plant project.[125] Plaintiffs' claim of impermissible segmentation could be rejected on this ground alone.

121. *See* Administrative R. at 2601 ("The data [that is gathered from the tower] may support the wind [project] but does not cause it to occur.... The data from the tower may be used in the application for the wind power project but will not automatically trigger such a project.").

122. *Id.* at 2594; *see also id.* at 2601 ("Although the data is intended to be used by the applicant to assist [it] in the engineering design for the wind project, it is not mandated by any regulatory requirement.").

123. *Id.* at 2601 ("Th[e] data gathering tower has independent utility for just the scientific data that will be gathered about wind, wave, and current conditions in Nantucket Sound provided [that] the scientific data that is gathered is made readily available to the public in accordance with [conditions set forth in] the permit."); *see Citizens' Comm. to Save Our Canyons v. United States Forest Serv.*, 297 F.3d 1012, 1029 (10th Cir.2002) ("Put simply, projects that have independent utility are not connected actions under 40 C.F.R. 1508.25(a)(1)(iii)."") (quoting *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1037 (10th Cir.2001)); *cf. Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir.1985) (finding that logging operations and the construction of a road were "connected actions" because "the timber sales [could not] proceed without the

road, and the road would not be built but for the contemplated timber sales"); *Ocean Mammal Inst. v. Cohen*, No. 98–CV–160, 1998 WL 2017631, at *8 (D.Hawaii March 9, 1998) (finding that a sonar research project was not a connected action to a sonar system deployment proposal because the "research has independent value ..."). The administrative record supports the Corps' conclusion that the data tower project has utility independent of the proposed wind energy plant project. *See* Administrative R. at 1450–53, 1863–66, 1870–71, 1873, 2915, 2917–18.

124. *Cf. Pres. Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs*, 87 F.3d 1242, 1247 (11th Cir.1996) ("[T]he Corps cannot 'evade [its] responsibilities' under [NEPA] by 'artificially dividing a major federal action into smaller components ....'") (quoting *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 68 (D.C.Cir. 1987)); *South Carolina v. O'Leary*, 64 F.3d 892, 898 (4th Cir.1995) ("[T]he segmentation of one phase of a larger project ... constitutes impermissible segmentation only if the component action has a 'direct and substantial probability of influencing [the agency's] decision' on the larger project.") (quoting *North Carolina v. City of Va. Beach*, 951 F.2d 596, 603 (4th Cir.1991)).

125. *See* Administrative R. 2597–98, 2601.

### 4. *Removal of the Data Tower*

Plaintiffs fault the Corps for failing to include in the EA a discussion of whether the environmental consequences of the tower's construction and removal are "cumulatively significant."[126] Yet, Plaintiffs have not pointed to any evidence that suggests that the tower's removal will cause additional environmental consequences beyond those associated with its construction and, therefore, their argument is without merit.

 The administrative record reveals that the environmental impacts associated with the tower's removal, which consists of the cutting of three steel piles, the loading of the tower on to a barge, and the transport of the tower to shore, will be insignificant.[127] For example, with regard to the cutting of the piles, the record states that a high-pressure water jet will be deployed *inside* each of the hollow piles.[128] The water jet will, in turn, cut the piles at a point approximately six feet *below the seabed.*[129] The record, thus, demonstrates that the Corps was aware of and considered the impacts of the tower's removal,[130] and it provides a basis for the Corps' conclusion that those impacts would be no greater than those caused by its construction (which the Corps discussed at length in the EA).[131] Plaintiffs' unsupported allegations that the tower's removal will cause environmental impacts beyond those associated with its construction are not enough to overcome the Corps' reasonable conclusion to the contrary.

126. Pls.' Opp'n Br. at 20.

127. *See* Administrative R. at 1869.

128. *Id.*

129. *Id.*

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED, Defendants' cross-motion for summary judgment is ALLOWED, and Intervenor's cross-motion for summary judgment is ALLOWED.

AN ORDER WILL ISSUE.

130. After all, the record discloses that the Corps included in the data tower permit a requirement that Cape Wind post a bond of $300,000 "so that there is money available to remove any debris or remains that are discovered after removal." *Id.* at 2604.

131. *Id.* at 1869, 2603, 2604, 2606.