# United States Court of Appeals
## For the First Circuit

---

No. 14-1597

TOWN OF BARNSTABLE,

Plaintiff, Appellant,

HYANNIS MARINA, INC.; MARJON PRINT AND FRAME SHOP LTD.; THE
KELLER COMPANY, INC.; ALLIANCE TO PROTECT NANTUCKET SOUND; SANDRA
P. TAYLOR; JAMIE REGAN,

Plaintiffs,

v.

ANGELA M. O'CONNOR, in her official capacity as Chair of the
Massachusetts Department of Public Utilities; JOLETTE A.
WESTBROOK, in her official capacity as Commissioner of the
Massachusetts Department of Public Utilities; ROBERT HAYDEN, in
his official capacity as Commissioner of the Massachusetts
Department of Public Utilities; JUDITH JUDSON, in her official
capacity as Commissioner of the Massachusetts Department of
Energy Resources; CAPE WIND ASSOCIATES, LLC;
NSTAR ELECTRIC COMPANY,

Defendants, Appellees.

---

No. 14-1598

HYANNIS MARINA, INC.; JAMIE REGAN; ALLIANCE TO PROTECT NANTUCKET
SOUND,

Plaintiffs, Appellants,

MARJON PRINT AND FRAME SHOP LTD.; THE KELLER COMPANY, INC.;
SANDRA P. TAYLOR; TOWN OF BARNSTABLE,

Plaintiffs,

v.

ANGELA M. O'CONNOR, in her official capacity as Chair of the
Massachusetts Department of Public Utilities; JOLETTE A.

WESTBROOK, in her official capacity as Commissioner of the Massachusetts Department of Public Utilities; ROBERT HAYDEN, in his official capacity as Commissioner of the Massachusetts Department of Public Utilities; JUDITH JUDSON, in her official capacity as Commissioner of the Massachusetts Department of Energy Resources; CAPE WIND ASSOCIATES, LLC; NSTAR ELECTRIC COMPANY,

Defendants, Appellees.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Stahl and Kayatta, Circuit Judges.

---

Ira H. Zaleznik, Joshua M. D. Segal, and Lawson & Weitzen LLP, on brief for appellant Town of Barnstable.

Matthew E. Price, with whom Adam G. Unikowsky, Jenner & Block LLP, Robert A. Bianchi, and Robert A. Bianchi & Associates, were on brief, for appellants Hyannis Marina, Inc., Jamie Regan, and Alliance to Protect Nantucket Sound.

Laurence H. Tribe, Jonathan S. Massey, and Massey & Gail LLP, on brief for appellant Alliance to Protect Nantucket Sound.

Timothy J. Casey, Assistant Attorney General, with whom Martha Coakley, Attorney General of Massachusetts, was on brief, for appellees Angela M. O'Connor, Jolette A. Westbrook, Robert Hayden, and Judith Judson.

David S. Rosenzweig, with whom Erika J. Hafner, Michael J. Koehler, Keegan Werlin LLP, Geraldine E. Edens, Christopher Marraro, and Baker & Hostetler LLP, were on brief, for appellee Cape Wind Associates, LLC.

John D. Donovan, Jr., Matthew L. McGinnis, and Ropes & Gray LLP, on brief for appellee NSTAR Electric Company.

---

May 18, 2015

---

**KAYATTA, <u>Circuit Judge</u>**. This appeal arises from the latest in a series of lawsuits by opponents of a proposed off-shore wind power generation facility in Nantucket Sound. Plaintiffs--who include the Town of Barnstable, a non-profit advocacy group named Alliance to Protect Nantucket Sound, and businesses and individuals residing near the proposed facility[1]--sought an injunction and a declaratory judgment in federal district court against officials of the Massachusetts Department of Public Utilities ("DPU") and the Massachusetts Department of Energy Resources ("DOER") (together, the "state defendants"),[2] and two private parties, Cape Wind Associates, LLC and NSTAR Electric Company,[3] whose contract to buy wind power DPU approved. The district court granted defendants' motions to dismiss after determining that the Eleventh Amendment precluded the assertion of federal court jurisdiction. For the

---

[1]    The other plaintiffs are Hyannis Marina, Inc., Marjon Print and Frame Shop Ltd., The Keller Company, Inc., Sandra P. Taylor, and Jamie Regan.

[2]    The state defendants are Angela M. O'Connor, in her official capacity as Chair of DPU; Jolette A. Westbrook and Robert Hayden, in their official capacities as Commissioners of DPU; and Judith Judson, in her official capacity as Commissioner of DOER. The officeholders for the above-listed positions have changed multiple times during this appeal. We list the current officeholders in accordance with Federal Rule of Appellate Procedure 43(c)(2), which provides that "[w]hen a public officer who is a party to an appeal . . . ceases to hold office, . . . [t]he public officer's successor is automatically substituted as a party."

[3]    Cape Wind and NSTAR were added as required parties pursuant to Federal Rule of Civil Procedure 19(a).

reasons explained below, we disagree that the Eleventh Amendment bars the assertion of federal court jurisdiction over plaintiffs' claims, and we remand for resolution of the case's status and the possible need to resolve a litany of other issues concerning the viability of the complaint.

## I.  Background[4]

Cape Wind has pursued development of offshore wind power in Nantucket Sound since at least 2001.  See Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army, 288 F. Supp. 2d 64, 67 (D. Mass. 2003).  The company has faced a series of challenges against its attempts to acquire the necessary permits and approvals for a planned 130-turbine, twenty-five square mile facility in the Sound.  See Town of Barnstable v. Berwick, 17 F. Supp. 3d 113, 116—20 (D. Mass. 2014).

Cape Wind's efforts at convincing electric utilities (also known as "electric distribution companies") to purchase its wind energy received a boost in 2008, when the Massachusetts legislature enacted the Green Communities Act (the "GCA").  2008 Mass. Acts ch. 169 ("An Act Relative to Green Communities").  Section 83 of the GCA requires each Massachusetts electric utility to "solicit proposals from renewable energy developers and . . . enter into cost-effective long-term contracts" with such developers

---

[4]    Our recital of the facts traces the allegations in the complaint, although for context we flesh out the story it tells with some additional facts from the record.

for up to three percent of the total energy demand in the utility's service territory.  Id. at § 83.  Section 83 further provides that "[t]he timetable and method for solicitation and execution of such contracts shall be proposed by the distribution company in consultation with [DOER] and shall be subject to review and approval by [DPU]."  Id.

As originally enacted, Section 83 permitted Massachusetts utilities to fulfill their renewable energy obligation only by entering into contracts for power generated "within the jurisdictional boundaries of the commonwealth, including state waters, or in adjacent federal waters."  Id.  In 2009, while that geographic limitation was still in place, Cape Wind entered into no-bid negotiations with National Grid--a competitor of NSTAR operating in Massachusetts--for National Grid's purchase of fifty percent of the wind energy generated by Cape Wind's proposed facility.  Cape Wind and National Grid later executed a contract, which they called a Power Purchase Agreement ("PPA").  According to plaintiffs' complaint, "[t]he National Grid contract prices were significantly above the market price for electricity and above the price of other renewable energy generation."

In 2010, a Canadian energy generator named TransCanada Power Marketing sued DPU, alleging that Section 83's geographic limitation unconstitutionally discriminated against interstate commerce in violation of the dormant Commerce Clause.  DPU settled

the suit by suspending the geographic limitation[5] and directing utilities such as NSTAR to reopen bidding opportunities to out-of-state generators. DPU did not, however, require National Grid to back out of its agreement with Cape Wind. DPU instead approved the Cape Wind-National Grid PPA in DPU Order 10-54.[6] See DPU Order 10-54 (Nov. 22, 2010) (final order).

NSTAR, for its part, subsequently received bids from forty-four renewable energy developers and entered contracts with three land-based wind generators, one located in-state and two out-

---

[5] The geographic limitation was initially suspended by Emergency Regulation. DPU later made the Emergency Regulations permanent, see 220 Mass. Code Regs. §§ 17.00—17.09, and the Massachusetts legislature subsequently removed the limitation from the statute by amendment, see 2012 Mass. Acts ch. 209, § 35 ("An Act Relative to Competitively Priced Electricity in the Commonwealth").

[6] DPU's approval of the Cape Wind-National Grid PPA was unsuccessfully challenged by the Alliance before the Massachusetts Supreme Judicial Court, Alliance to Protect Nantucket Sound, Inc. v. Dep't of Pub. Utils., 461 Mass. 166, 167—68, 189 (2011), and by a separate group of plaintiffs before the Federal Energy Regulatory Commission ("FERC"), Californians for Renewable Energy, Inc. (Care), 137 FERC ¶ 61,113 (Nov. 7, 2011) (Order Dismissing Complaint) (the "Care Complaint").
The Massachusetts SJC rejected the Alliance's argument that the fact that the geographic limitation was still in effect "'tainted' the contracting process and [DPU's] approval of [the PPA] in violation of the commerce clause," finding instead that "National Grid entered into [the PPA] for reasons unrelated to the geographic limitation provision" and thus there was no commerce clause violation. Alliance, 561 Mass. at 172—74. The Care Complaint, according to FERC, "consist[ed] of a string of vague and unsupported allegations that [DPU's] order violates the [Federal Power Act], [Public Utility Regulatory Policies Act] and previous [FERC] orders," none of which had merit. 137 FERC ¶ 61,113 at para. 32.

of-state. According to the complaint, NSTAR contracted to buy energy with those three companies at half the initial price Cape Wind was charging National Grid pursuant to the Cape Wind-National Grid PPA.

Later in 2010, NSTAR filed an application with DPU requesting that it approve NSTAR's proposed merger with Northeast Utilities, a Connecticut-based electric utility distribution company.[7] At the time, DPU applied a "no net harm" standard in assessing merger applications, meaning that mergers would be approved so long as the public interest "would be at least as well served by approval of a proposal as by its denial." See D.P.U. Order 10-170 (Mar. 10, 2011) (interlocutory order on standard of review). Cape Wind and DOER, among others, intervened in the DPU proceeding. DOER proposed a more stringent "substantial net benefit" standard that would take into account "the advancement of clean energy goals established by the [GCA] and the Global Warming Solutions Act ['GWSA']." DOER also asked DPU to require NSTAR to purchase off-shore wind energy as a condition for approving the merger with Northeast Utilities.

After taking the parties' and intervenors' positions under advisement, DPU chose to adopt a "net benefit" standard for

_____

[7] DPU approval is required for all mergers of utilities subject to its jurisdiction. Mass Gen. Laws ch. 164, § 96 (2012). Approval is only permitted if DPU finds the merger is "consistent with the public interest." Id.

electric utility mergers, which was more demanding than the existing "no net harm" standard but less stringent than the "substantial net benefit" standard that DOER requested. DPU justified the new standard in part by pointing out that this was its first opportunity to consider a merger of electric utilities since the Massachusetts legislature enacted (1) the GCA, which specifically provided that DPU, in reviewing a merger transaction, must consider whether the merger will contribute to a "reliable, cost effective energy delivery system," 2008 Mass. Acts ch. 169, § 69, amending Mass. Gen. Laws ch. 164, § 96, and (2) the GWSA, which required that all Massachusetts state agencies "consider reasonably foreseeable climate change impacts" in issuing administrative approvals and decisions, 2008 Mass. Acts ch. 298, § 7, amending Mass. Gen. Laws ch. 30, § 61. DPU reasoned that these legislative changes required it to put more emphasis on the "benefits" side of the equation than it had in the past.

DOER then moved for a stay of the merger proceeding, ostensibly so that it could determine the effect the merger would have on consumers' utility rates. NSTAR and Northeast Utilities contested the stay, informing DPU that the delay jeopardized the merger agreement due to the agreement's internal deadlines and evolving circumstances that could "affect the financial underpinnings of the transaction." The complaint alleges that the foregoing actions of DOER represented an "implicit threat to

scuttle the merger unless NSTAR entered into a contract with Cape Wind."

Of course, it was DPU, not DOER, that got to decide whether and on what terms the merger would be approved. Nevertheless, the theory of the complaint is that DOER's politically potent advocacy was enough of a threat to cause NSTAR to enter into "secret negotiations" with the Massachusetts Governor's administration in order to win the administration's support for NSTAR's merger with Northeast Utilities. Those negotiations culminated on February 15, 2012, with a settlement agreement between NSTAR and DOER.

The settlement agreement included, among other provisions, a clause that NSTAR would purchase 27.5% of Cape Wind's output under a proposed fifteen-year power purchase agreement ("the PPA"), and a clause stating that DOER agreed that the merger "is consistent with the public interest." Under the settlement agreement, Cape Wind and NSTAR's contract would contain terms substantially the same as the terms of the Cape Wind-National Grid PPA. Performance of that contract would cause NSTAR's renewable energy usage to rise from 1.6% to 3.5% of its total production portfolio, thus exceeding Section 83's statutory threshold. The proposed contract was contingent upon, among other things, Cape Wind's timely procurement of financing and building permits, DPU's approval of the PPA itself, and FERC's approval of the PPA's rates.

On February 24, 2012, after entering the settlement agreement, NSTAR, Cape Wind, and DOER submitted a Memorandum of Understanding ("MOU") to DPU seeking approval of a method and timetable for negotiating the Cape Wind-NSTAR PPA. DPU approved the MOU (but not yet the PPA itself) on March 22, 2012, see DPU Order 12-19 (Mar. 22, 2012) (final order), and Cape Wind and NSTAR executed the PPA the next day. On April 4, 2012, DPU approved NSTAR's merger with National Grid. See DPU Order 10-170-B (Apr. 4, 2012) (final order).

After three public comment hearings and two evidentiary hearings, DPU issued a final decision on November 26, 2012, approving the Cape Wind-NSTAR PPA. See DPU Order 12-30 (Nov. 26, 2012) (final order) (hereinafter "Order 12-30"). Pursuant to Order 12-30, DPU has an ongoing responsibility to review NSTAR's recovery of above-market costs in its annual reconciliation filings. According to the PPA itself, DPU will also serve as the arbiter for determining when "Physical Construction" of the Nantucket Sound facility commences under the PPA. The PPA provides that if Cape Wind fails to begin Physical Construction prior to December 31, 2015, NSTAR "shall terminate" the PPA on that date.

Plaintiffs declined to appeal Order 12-30 directly to the Massachusetts Supreme Judicial Court, as was their right under

-10-

Mass. Gen. Laws ch. 25 § 5,[8] and instead filed this action in federal district court fourteen months later, claiming that they would incur higher electricity rates under the PPA and suffer "negative impacts to the environment, regional economy, historic and cultural resources, public safety, and recreational opportunities."

Plaintiffs' complaint sought "a declaration that the Commonwealth of Massachusetts violated both the dormant Commerce Clause and the Supremacy Clause when it used its influence over NSTAR's merger request to bring about NSTAR's entry into an above-market wholesale electricity contract with Cape Wind," and "appropriate injunctive relief to remedy the constitutional violation and invalidate the contract that Massachusetts compelled NSTAR to enter." More specifically, Count 1 of the complaint alleged that by "requiring" NSTAR to enter the PPA with a particular party at a particular price instead of allowing NSTAR to freely negotiate the contract, DOER "violated federal law and policy which requires wholesale electric energy prices to be set pursuant to freely-negotiated market transactions."[9] Count 2

_____

[8] "An appeal as to matters of law from any final decision, order or ruling of [DPU] may be taken to the supreme judicial court by an aggrieved party in interest by the filing of a written petition praying that the order of [DPU] be modified or set aside in whole or in part." Id.

[9] The Federal Power Act places the regulation of interstate wholesale electric energy transmission and rates exclusively under federal control. See 16 U.S.C. § 824(a) and (b); Nantahala Power

-11-

alleged that "[b]y conditioning its approval of the merger on the execution of a PPA between NSTAR and Cape Wind, DOER prevented out-of-state generation facilities from competing with Cape Wind," and "[t]herefore, DOER's actions had a discriminatory effect on out-of-state business and violated the dormant Commerce Clause."[10]

The state defendants (collectively), Cape Wind, and NSTAR each submitted their own motions seeking dismissal on grounds of sovereign immunity, preclusion, lack of ripeness, and plaintiffs' failure to state a plausible claim under either the Supremacy or Commerce Clause. The district court, in an opinion we describe in more detail below, determined that "the debate begins and ends with the Eleventh Amendment," and held that sovereign immunity barred the court's jurisdiction to hear plaintiffs' claims. In a series of footnotes, the district court also expressed doubts about whether plaintiffs had standing to press their claims and the merits of their underlying substantive allegations. This timely

_____

& Light Co. v. Thornburg, 476 U.S. 953, 966 (1986). As the Third Circuit recently explained, "[w]hile FERC once directly considered whether the wholesale rates submitted to it were 'just and reasonable,'" the agency now "favors using market mechanisms to produce competitive rates for interstate sales and transmissions of energy." PPL Energyplus, LLC v. Solomon, 766 F.3d 241, 247 (3d Cir. 2014).

[10] The clause of the Constitution granting Congress the power to regulate interstate commerce, U.S. Const. art. I, § 8, cl. 3, "embodies a negative aspect as well--the 'dormant Commerce Clause,'" which "prohibits protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 35 (1st Cir. 2005) (internal quotation marks omitted).

appeal from the district court's dismissal with prejudice followed.[11]

## II.  Discussion

## A.  Standard of Review

A district court's dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) is reviewed de novo.  See Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995).  As when we review a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "we construe the Complaint liberally and treat all well-pleaded facts as true, according the plaintiff[s] the benefit of all reasonable inferences."  Id.; accord Negron-Gaztambide v. Hernandez-Torres, 35 F.3d 25, 27 (1st Cir. 1994).

## B.  Sovereign Immunity

### 1.  The Applicable Law

The Eleventh Amendment of the United States Constitution provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend XI.  "Long interpreted as an affirmation of state sovereign immunity[,] . . . [the] amendment (despite its literal

_____

[11]  The Town of Barnstable and the Alliance (joined by Hyannis Marina, Inc. and Jamie Regan) filed separate notices of appeal, which we consolidated.

text) also bar[s] a citizen from bringing a federal court action against his or her own State," Maysonet-Robles v. Cabrero, 323 F.3d 43, 48 (1st Cir. 2003) (citation and footnote omitted), including instrumentalities of the state, such as state agencies, see Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429–30 (1997).

Broad as it may seem, "[t]his proscription is subject to a well recognized exception memorialized in Ex parte Young," 209 U.S. 123, 159—60 (1908), which permits "federal courts, notwithstanding the absence of consent, waiver or evidence of congressional assertion of national hegemony, [to] enjoin state officials to conform future conduct to the requirements of federal law." Rosie D. ex rel. John D. v. Swift, 310 F.3d 230, 234 (1st Cir. 2002) (alteration in original) (internal quotation marks omitted). A "pivotal question" under Ex parte Young is whether the relief "serves directly to bring an end to a present violation of federal law." Whalen v. Mass. Trial Court, 397 F.3d 19, 29 (1st Cir. 2005) (internal quotation marks omitted). The exception memorialized in Ex parte Young, in turn, itself has exceptions. The Constitution does not permit relief that "would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment." Mills v. Maine, 118 F.3d 37, 55 (1st Cir. 1997) (internal quotation marks omitted) (quoting

Green v. Mansour, 474 U.S. 64, 73 (1985)); see also Edelman v. Jordan, 415 U.S. 651, 668 (1974). And Congress may render the Ex parte Young exception inapplicable by "prescrib[ing] a detailed remedial scheme for the enforcement against a State of a statutorily created right." Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 74 (1996).

In Verizon Maryland, Inc. v. Public Service Commission of Maryland, 535 U.S. 635 (2002), where, as here, plaintiffs sued a state regulatory commission for issuing an order that was allegedly preempted by federal law, the Supreme Court articulated the sovereign immunity inquiry as follows: "In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Id. at 645 (alteration in original) (internal quotation marks omitted). The Court reasoned that a request "that state officials be restrained from enforcing an order in contravention of controlling federal law . . . clearly satisfies our 'straightforward inquiry.'" Verizon, 535 U.S. at 646. Moreover, a declaration of the "past, as well as the future, ineffectiveness of the [state commission's] action" was not barred because it did "not impose upon the State 'a monetary loss resulting from a past breach of a legal duty on the

-15-

part of the defendant state officials.'" Id. (quoting Edelman, 415 U.S. at 668).

Critically for our decision in this case, the Supreme Court in Verizon also expressly rejected the Fourth Circuit's suggestion that the claim could not be brought due to the latter's view that "the [state commission's] order was probably not inconsistent with federal law after all." Id. The Court responded by stating that the "inquiry into whether suit lies under Ex parte Young does not include an analysis of the merits of the claim." Id. (citing Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 281 (1997) ("An allegation of an ongoing violation of federal law . . . is ordinarily sufficient to invoke [Ex parte Young].")).

This "straightforward inquiry" is not always so straightforward. See Verizon, 535 U.S. at 648—49 (Kennedy, J., concurring) (calling the Verizon test "deceptively simple"). Rather, "the difference between the type of relief barred by the Eleventh Amendment and that permitted under Ex parte Young will not in many instances be that between day and night." Edelman, 415 U.S. at 667. Also, there are "certain types of cases that formally meet the [Ex parte] Young requirements of a state official acting inconsistently with federal law but that stretch that case too far and would upset the balance of federal and state interests that it embodies." Papasan v. Allain, 478 U.S. 265, 277 (1986).

-16-

With the foregoing as our guide, we examine plaintiffs' complaint, with special attention to the ongoing nature of the alleged offense and the type of relief sought.

## 2. Application of that Law to this Case

The complaint first asks the court to "[e]njoin[] the DPU from enforcing its order approving the PPA"--a contract that is enforceable purely due to DPU's (allegedly unconstitutional) Order 12-30.  And it requests a declaratory judgment that DPU Order 12-30, which plaintiffs say is in effect "forc[ing] [NSTAR] to purchase power pursuant to the Cape Wind-NSTAR contract," be nullified.  As pled by plaintiffs, the continued enforceability of the PPA represents an ongoing violation of federal law because Order 12-30 binds the parties to abide by the PPA's allegedly unconstitutional terms.  The relief requested is "properly categorized as prospective" because it is trained at preventing future contract performance and avoiding damages that plaintiffs have yet to incur.  Verizon, 535 U.S. at 645 (internal quotation marks omitted).

The district court did not claim that plaintiffs sought damages from the state treasury.  It also implicitly recognized that a claim for money damages is not a sine qua non for finding a lack of federal court jurisdiction.  See Coggeshall v. Mass. Bd. of Registration of Psychologists, 604 F.3d 658, 666 n.4 (1st Cir. 2011) ("We do not imply that the Eleventh Amendment bars claims

only for money damages.  That is not the case.").  In this manner, the district court correctly reached the key question: is the requested relief "properly characterized as prospective."  Va. Office for Prot. & Advocacy v. Stewart, 131 S. Ct. 1632, 1639 (2011) (quoting Verizon, 535 U.S. at 645 (internal quotation marks omitted).  In answering this question in the negative, the district court found that:

> [T]he effect of a declaration that Massachusetts had illegally compelled [NSTAR] and Cape Wind to enter an above-market price contract for wind energy would inevitably lead to restitutionary claims against the Commonwealth by NSTAR and Cape Wind, while an injunction ordering DPU to cease enforcement of the PPA and to take remedial measures for the alleged constitutional harms would restrain the State from acting by frustrating its efforts to implement the policies enunciated in the GCA and the GWSA, while further bleeding the treasury.

(Footnote omitted).  We agree with plaintiffs that the district court erred in this crucial finding.

First, the hypothetical future "restitutionary claims" the district court forecasts are both conjectural and capable of being addressed on their own terms.  As plaintiffs persuasively argue, "even if NSTAR or Cape Wind could identify some plausible claim for damages against the state and were thereupon to file suit, that suit could then be dismissed on grounds of sovereign immunity, and the State's treasury would be undisturbed."  So, whether a future suit by plaintiffs, NSTAR, or someone else that

-18-

would in fact "bleed the treasury" may be barred by the Commonwealth's sovereign immunity, we need not decide in this case.

Second, a conclusion that the requested equitable relief "would restrain the State from acting by frustrating its efforts to implement the policies enunciated in the GCA and the GWSA" does not resolve the sovereign immunity inquiry. The Ex parte Young doctrine's very existence means that a plaintiff may frustrate the efforts of a state policy when those efforts violate or imminently threaten to violate the plaintiff's constitutional rights and the plaintiff confines its request to the proper form of relief.

Defendants also argue that DPU has no ongoing role in enforcing the PPA, and that therefore there can be no "ongoing violation" of federal law under Verizon. They reiterate the district court's observation that the complaint itself does not refer to "any future actions the State Defendants must take with respect to the contract." Thus, defendants say, the relief plaintiffs seek is "entirely retrospective" and falls outside of the Ex parte Young doctrine.

On this point, too, plaintiffs have a persuasive response. DPU does in fact possess an ongoing responsibility with respect to the PPA, because Order 12-30 states that DPU will "review NSTAR Electric's recovery of above-market costs in its annual reconciliation filings" to "ensure that [NSTAR] recovers such costs in a manner approved by [DPU]." The PPA itself, which

-19-

DPU approved, also provides that "upon petition by" NSTAR, DPU shall determine whether "Physical Construction" has commenced by December 31, 2015, and if it has not commenced, NSTAR "shall terminate" the PPA as of said date.[12]  The fact that Order 12-30 occurred in the past therefore does not itself push the complaint outside the confines of the Ex parte Young doctrine.  Logic supports this conclusion:  most unconstitutional agency determinations will have occurred in the past by the time a lawsuit is brought; sovereign immunity does not necessarily prevent suits against such state actions when the alleged violation they spur is ongoing and no raid on the state treasury will result.  See Verizon, 535 U.S. at 646.

For the foregoing reasons, we conclude that the district court erred in finding that the relief sought by plaintiffs is retroactive and thus outside the reach of the Ex parte Young exception.

---

[12]  Plaintiffs did not attach the PPA or Order 12-30 to their complaint.  Each was introduced below for the first time as an exhibit to the defendants' motions to dismiss.  Ordinarily, in considering a motion to dismiss, we would not consider extraneous documents unless they are attached to the complaint or expressly incorporated therein, or unless the proceeding was properly incorporated into one for summary judgment under Federal Rule of Civil Procedure 56.  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  However, we have made an exception "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint."  Id. at 3—4 (collecting cases).  That exception applies to both the PPA and Order 12-30.

## C.  Alternative Arguments For Affirmance

Anticipating the possibility that we would reverse the sovereign immunity holding, defendants point us to several other alternative arguments for affirming a judgment of dismissal, all of which were advanced in the district court, but not addressed by the court other than signaling that it tended to find at least some of those grounds for dismissal persuasive.  Our precedent gives us the discretion whether to reach those arguments in the first instance, or to remand.  See, e.g., United States ex rel. Estate of Cunningham v. Millennium Labs. of Cal., Inc., 713 F.3d 662, 675—76 (1st Cir. 2013) (remanding for a determination of whether relator's claims were well-pled under Fed. R. Civ. P. 12(b)(6) and 9(b) after finding error in the district court's decision that it lacked jurisdiction); Aguilar v. U.S. Immigration & Customs Enforcement, 510 F.3d 1, 21 (1st Cir. 2007) (assessing the viability of petitioners' claims on the merits after finding that the district court erroneously dismissed the case on jurisdictional grounds).  Our exercise of that discretion in this instance is guided by developments that occurred after briefing was complete.

On December 31, 2014, a week before we heard oral arguments in this case, Cape Wind notified NSTAR that it had failed to timely meet certain financing deadlines ("Critical Milestones") defined in the PPA.  NSTAR then sent a letter dated January 6, 2015 to Cape Wind, stating that NSTAR was invoking its right to

terminate the PPA due to that default, in accordance with the rights reserved to NSTAR by the PPA's remedies provisions.  On the next day, NSTAR filed a letter with this court notifying us of the termination and opining that the termination mooted this appeal. We responded by instructing the parties to submit supplemental briefing to explain what had occurred and to set forth any arguments about the mootness or ripeness of the appeal following NSTAR's purported termination.  Predictably, the parties disagree about whether NSTAR's termination is "valid" under the contract, whether Cape Wind has taken the steps necessary to preserve the contract in the face of NSTAR's attempted termination, and whether Cape Wind has a plausible defense to NSTAR's termination under the PPA's "Force Majeure" Clause.

The parties also advance different views on the mootness/ripeness issue:  NSTAR argues that the appeal is both moot and unripe; plaintiffs argue that the appeal is unripe but not moot; Cape Wind says it is neither; and the state defendants take no position on the mootness/ripeness issue.

The Supreme Court has placed the "heavy burden of persuasion" with respect to mootness on the party advocating for it.  United States v. Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203 (1968); accord Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222 (2000).  The Court has used strong limiting language to describe the mootness inquiry:  Intervening events must "have

-22-

completely and irrevocably eradicated the effects" of the parties' conduct in order for a case to be deemed moot. <u>Cnty. of Los Angeles</u> v. <u>Davis</u>, 440 U.S. 625, 631 (1979); <u>accord</u> <u>Knox</u> v. <u>Serv. Emps. Int'l Union, Local 1000</u>, 132 S. Ct. 2277, 2287 (2012) ("[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." (alteration in original) (internal quotation marks omitted)).

If Cape Wind agreed that NSTAR's termination of the PPA was valid, we would have little difficulty determining that the case was moot. There would be no legally binding contract enforcement to enjoin, and a declaration of the defunct PPA's illegality would be "merely advisory." <u>Am. Civil Liberties Union of Mass.</u> v. <u>U.S. Conference of Catholic Bishops</u>, 705 F.3d 44, 53, 58 (1st Cir. 2013) ("The expiration of a contract on its own terms constitutes . . . a mooting event."); <u>cf.</u> <u>Lake Coal Co., Inc.</u> v. <u>Roberts & Schaefer Co.</u>, 474 U.S. 120, 120 (1985) (per curiam) (complete, uncontested settlement moots appeal).

NSTAR's termination of the contract, however, is contested by Cape Wind. Therefore, to find that NSTAR's purported contract termination "completely and irrevocably eradicated the effects" of Order 12-30, <u>Cnty. of Los Angeles</u>, 440 U.S. at 631, we would need to adjudicate the merits of the termination dispute. Such a need itself suggests that there presently remains a live controversy. <u>See</u> <u>Chico Serv. Station, Inc.</u> v. <u>Sol P.R. Ltd.</u>, 633

F.3d 20, 36 (1st Cir. 2011) (deciding that "[w]e cannot conclude that [the plaintiff's] claim . . . is moot," because "there appear to be unresolved disputes as to whether [the defendant] has met its . . . obligations" under the relevant statute); cf. United States v. Hahn, 359 F.3d 1315, 1323 (10th Cir. 2004) (en banc) (distinguishing an earlier-decided, mooted case because the parties to a civil settlement agreement did not challenge the agreement's validity, whereas the plea agreement in the instant case did not moot defendant's sentencing challenge because defendant sought to void the agreement).  We find particularly instructive the fact that NSTAR predicates its mootness argument on its own interpretations of the PPA's termination and force majeure clauses, while simultaneously telling us that, due in part to the contract's dispute resolution provisions, federal courts lack jurisdiction to decide that its (contested) interpretations are correct.[13]

Nor does NSTAR's challenged contract termination lead us to conclude that the ripeness doctrine divests this court (or the district court on remand) of jurisdiction to adjudicate plaintiffs' claims.  "[W]here challenges are asserted to government actions and ripeness questions arise, a court must consider both 'fitness' for

_____

[13] More specifically, NSTAR claims in its supplemental brief that both this court and the federal district court lack jurisdiction to adjudicate a contractual dispute concerning the PPA due to the PPA's forum selection clause and the absence of federal subject matter jurisdiction.  We take no position on either argument.

-24-

review and 'hardship.'" <u>Verizon New England, Inc.</u> v. <u>Int'l Bhd. of Elec. Workers, Local No. 2322</u>, 651 F.3d 176, 188 (1st Cir. 2011).

The "fitness for review" inquiry centers upon "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." <u>Ernst & Young</u> v. <u>Depositors Econ. Prot. Corp.</u>, 45 F.3d 530, 536 (1st Cir. 1995) (internal quotation marks omitted). Resolution of the actual claim here--that Massachusetts officials unconstitutionally forced NSTAR to enter a contract with Cape Wind--hinges on an assessment of events that have already occurred. All that is contingent and uncertain is the possibility that the dispute about the lawfulness of the Commonwealth's actions may become moot. If we were to find the possibility of future mootness to be the type of contingency that would create a lack of ripeness, we would simply be changing mootness doctrine to signal a lack of jurisdiction not merely when a controversy is moot, but also when it might become moot.

The hardship inquiry is best articulated in a "positive vein." <u>Verizon New England</u>, 651 F.3d at 188 (quoting <u>Rhode Island</u> v. <u>Narragansett Indian Tribe</u>, 19 F.3d 685, 693 (1st Cir. 1994)). It turns on "whether granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest." <u>Id.</u> (internal quotation marks omitted). That standard is satisfied here because Cape Wind and/or NSTAR would undoubtedly act

differently tomorrow, and be able to spend their resources with less risk of waste, if they learned today that DPU's approval of the PPA is invalid. See Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council, 589 F.3d 458, 468—69 (1st Cir. 2009) (deciding that case was ripe in part because a holding on the merits would cause the contested agency decisions and regulations to "cease to be barriers to ultimate approval of the project"). Of course, the added factor of potential mootness may make it easier to bet on how best to act in the face of any dilemma created by plaintiffs' legal challenge. But, again, we can find no basis for expanding the grounds for finding jurisdictional mootness simply by relabeling the potential for future mootness to be a lack of ripeness.

We conclude, therefore, that for our purposes there remains a case or controversy. That being said, however, what facially appears to be a serious potential for this case to become moot does cause us to decline to exercise our discretion to reach out now to decide questions of law upon which the district court has itself not yet focused or addressed other than in passing. The district court is better able than is this court to determine the imminency of the contract termination dispute's resolution and, within reason, set the schedule for resolving plaintiffs' claims accordingly. It may be, too, that with the Ex parte Young issue resolved, the parties may themselves agree on a sensible priority for resolving the contract issues and the remaining legal

challenges to the contract's validity.

### III. Conclusion

We express no view on whether the complaint's factual allegations with respect to either substantive claim are otherwise sufficiently well-pled to survive a Rule 12(b)(6) motion for failure to state a claim.  See Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012).  Nor do we express any opinion on the validity of defendants' other bases for a motion to dismiss such as whether plaintiffs have standing to press their claims or whether they possess a private right of action under the Supremacy Clause.  We simply hold that: the district court erred in concluding that plaintiffs' claims fall outside the Ex parte Young exception to the Eleventh Amendment; and that the case is now neither moot nor unripe.

We therefore vacate the judgment of dismissal, and remand this case to the district court for actions consistent with this opinion.