# United States Court of Appeals
## For the First Circuit

No. 18-1108

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD
FOR PUERTO RICO, AS REPRESENTATIVE FOR THE
COMMONWEALTH OF PUERTO RICO,

Debtor.

AURELIUS CAPITAL MASTER, LTD.; ACP MASTER, LTD.; AURELIUS
CONVERGENCE MASTER, LTD.; AURELIUS INVESTMENT, LLC; AURELIUS
OPPORTUNITIES FUND, LLC; AUTONOMY MASTER FUND LIMITED;
CORBIN OPPORTUNITY FUND, L.P.; FCO SPECIAL OPPORTUNITIES
(A1) LP; FCO SPECIAL OPPORTUNITIES (D1) LP; FCO SPECIAL
OPPORTUNITIES (E1) LLC - MASTER SERIES 1; FUNDAMENTAL CREDIT
OPPORTUNITIES MASTER FUND, LP; JACANA HOLDINGS I, LLC; JACANA
HOLDINGS II, LLC; JACANA HOLDINGS III, LLC; JACANA HOLDINGS IV,
LLC; JACANA HOLDINGS V, LLC; LEX CLAIMS, LLC; LMAP 903 LIMITED;
MCP HOLDINGS MASTER LP; MONARCH ALTERNATIVE SOLUTIONS MASTER
FUND LTD; MONARCH CAPITAL MASTER PARTNERS II LP; MONARCH CAPITAL
MASTER PARTNERS III LP; MONARCH CAPITAL MASTER PARTNERS IV LP;
MONARCH DEBT RECOVERY MASTER FUND LTD.; MONARCH SPECIAL
OPPORTUNIES MASTER FUND LTD.; MPR INVESTORS, LLC; P MONARCHY
RECOVERY LTD.; PINEHURST PARTNERS, LP; PRISMA SPC HOLDINGS LTD -
SEGREGATED PORTFOLIO AG; RRW I LLC,

Plaintiffs, Appellants,

P STONE LION IE, A FUND OF PERMAL MANAGED ACCOUNT PLATFORM ICAV;
PERMAL STONE LION FUND; SENATOR GLOBAL OPPORTUNITY MASTER FUND
LP; SL LIQUIDATION FUND LP; SL PUERTO RICO FUND II, L.P.;
SL PUERTO RICO FUND LP,

Plaintiffs,

v.

COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,* U.S. District Judge]

Before

Howard, Chief Judge,
Torruella, and Thompson, Circuit Judges.


Lawrence S. Robbins, with whom Mark T. Stancil, Donald Burke, Peter B. Siegal, and Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP were on brief, for appellants.
Martin J. Bienenstock, with whom Stephen L. Ratner, Timothy W. Mungovan, Mark D. Harris, Jonathan E. Richman, Jeffrey W. Levitan, and Proskauer Rose LLP were on brief, for appellees.
Ian Heath Gershengorn, with whom Lindsay C. Harrison, Robert Gordon, Richard Levin, Catherine Steege, and Melissa Root, were on brief, for intervenor The Official Committee of Retired Employees of the Commonwealth of Puerto Rico.
Beth Heifetz, with whom Benjamin Rosenblum, Bruce Bennett, Geoffrey S. Stewart, Victoria Dorfman, Christopher DiPompeo, Sparkle L. Sooknanan, Parker Rider-Longmaid, Jones Day, Alfredo Hernández-Martínez, Delgado & Fernández, LLC, on brief, for amici curiae Altair Global Credit Opportunies Fund (A), LLC, et al.


March 26, 2019

---

* Of the Southern District of New York, sitting by designation.

-2-

**TORRUELLA**, **Circuit Judge**.  We are once again required to consider an appeal arising from the restructuring of Puerto Rico's public debt under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act of 2016 ("PROMESA").  See generally Aurelius Inv., LLC v. Commonwealth of P.R., 915 F.3d 838, 844-47 (1st Cir. 2019) (discussing PROMESA and the capabilities of the Board it created).  Appellants are Puerto Rico general obligation ("GO") bondholders ("Bondholders"). On June 27, 2017, they filed suit seeking injunctive and declaratory relief claiming that they possess a priority and property interest over certain revenues of the Puerto Rico government.  Specifically, the Bondholders sought declarations to confirm their property rights to the revenues; determine that the diversion of the revenues constitutes an unconstitutional taking; and specify permissible uses for these revenues.  Appellee, the Financial Oversight and Management Board for Puerto Rico ("Board")[1], thereafter filed -- as sole representative of the Commonwealth in the Title III proceedings -- a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim.  The district court granted the Board's motion on January 30, 2018, and the instant appeal ensued.

---

[1]  For our decision regarding the constitutionality of the Board members' appointment, see Aurelius Inv., 915 F.3d 838.

-3-

Before us, the Bondholders challenge the district court's decision to dismiss Counts 3 to 6 of their complaint as seeking improper advisory opinions; Count 8, presenting a Takings Claim, as unripe; and Counts 1, 2, 9, and 10 as barred under Section 305 of PROMESA.  We affirm.

## I.

In reviewing a district court's dismissal pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), "we consider only 'the facts alleged in the complaint, and exhibits attached thereto.'"  Newman v. Lehman Bros. Holdings Inc., 901 F.3d 19, 25 (1st Cir. 2018) (quoting Freeman v. Town of Hudson, 714 F.3d 29, 35 (1st Cir. 2013)).  We accordingly derive the details that follow from the Bondholders' complaint.

Appellants -- the Bondholders -- own a substantial amount of GO bonds and other debt issued by Commonwealth entities. The Bondholders characterize the GO bonds as "Constitutional Debt" because it is "secured by an absolute and enforceable first claim and enforceable first claim and lien on all of the Commonwealth's 'available resources,' in addition to, and complemented by, a pledge of the Commonwealth's good faith, credit, and taxing power" under the Puerto Rico Constitution.  Along with this priority claim, the Bondholders allege a property interest in revenues "that, although conditionally earmarked for payment of certain

obligations of Commonwealth instrumentalities, are required by Puerto Rico law to be 'clawed back' for the express and sole purpose of paying Constitutional Debt when other available resources are insufficient to do so." They refer to these revenues as the "Clawback Revenues." Lastly, the Bondholders assert a claim over "certain proceeds of property taxes that Puerto Rico statutory law requires be levied and collected for the benefit of Constitutional Debtholders and segregated in a trust for the express and sole purpose of paying Constitutional Debt." The Bondholders refer to these as the "Special Property Tax Revenues," which together with the "Clawback Revenues" make up what they anoint as the "Restricted Revenues" that the Commonwealth must set aside to repay the "Constitutional Debt" that they own. According to the Bondholders, in 2017, the Commonwealth collected approximately $940 million in "Restricted Revenues," and it will collect an equal or greater amount in upcoming years.

The Bondholders base their priority claims on several authorities. First, they point to the Puerto Rico Constitution, which provides in relevant part that when "the available resources . . . are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall be first paid."[2] P.R. Const. art. VI, § 8. The Bondholders also

---

[2] The Bondholders also look to Article VI, Sections 2, 6, and 7

claim that Section 4(c) of the Office of Management and Budget Organic Act, P.R. Laws Ann. tit. 23, § 104(c)(1), establishes the same priority. Finally, the Bondholders note that the 2014 GO Bond Resolution and the Official Statement for the 2006 Puerto Rico Infrastructure Financing Authority bonds establish that the "[t]he Constitution of Puerto Rico provides that public debt . . . constitutes a first lien on available Commonwealth taxes and revenues." In support of their alleged property interest in the "Restricted Revenues," the Bondholders rely again on provisions of the Commonwealth Constitution, as well as on several local laws and executive orders that they describe as creating the "Restricted Revenues."

The Bondholders aver that, since 2015, the Commonwealth government, "first through its elected leaders and now through the Oversight Board[,] has engaged in a consistent pattern of unlawful conduct designed to avoid their obligations to Constitutional Debtholders for the benefit of more politically favored causes and creditors." Specifically, they claim that in fiscal year 2016 the

---

of the Puerto Rico Constitution and aver that: (1) if the government does not appropriate funds in its budget to pay the "Constitutional Debt" that is due, payments for that debt will be automatically appropriated in the next fiscal year; (2) the Commonwealth must have a balanced budget but, when it does not, it must increase its taxes; and (3) there is a limit on how much "Constitutional Debt" the Commonwealth can take on.

Commonwealth clawed back around $289 million in "Clawback Revenues," yet failed to apply any of these to the repayment of "Constitutional Debt." The Bondholders insist that this conduct has continued since 2016. As an example, they note that neither the Fiscal Plan the Board certified in March 2017 nor the 2018 fiscal year budget provide for the setting aside of "Clawback Revenues" to service the "Constitutional Debt."

Based on the foregoing allegations, the Bondholders' complaint sought the following:

> [I]n **Counts One and Two** . . . declaratory judgments that under Puerto Rico law, the Restricted Revenues are restricted by law and cannot be used by the Commonwealth for any purpose except to satisfy the Commonwealth's payment obligations with respect to outstanding Constitutional Debt.

> In **Counts Three and Four** . . . declaratory judgments that the Commonwealth lacks any equitable or beneficial property interest in the Restricted Revenues, and [Bondholders], as Constitutional Debtholders, have equitable and beneficial property interests in the Restricted Revenues.

In **Counts Five and Six** . . . declaratory judgments that [Bondholders], as Constitutional Debtholders, have a statutory lien on the Restricted Revenues.

In **Count Seven** . . . a declaratory judgment that the Clawback Revenues are special revenues as defined in the Bankruptcy Code.

In **Count Eight** . . . a declaratory judgment that the [Commonwealth]'s diversion of the Restricted Revenues without just compensation is an unlawful taking under the Fifth Amendment of the United States Constitution.

In **Counts Nine and Ten . . .** declaratory judgments that, under Puerto Rico law, the Restricted Revenues must be segregated and deposited into a designated account for the exclusive benefit of Constitutional Debtholders and not commingled with other funds of the Commonwealth or used for any purpose other than repayment of Constitutional Debt.

In **Count Eleven . . .** injunctive relief enjoining [the Commonwealth] from continuing to divert the Restricted Revenues, and directing [the Commonwealth] to segregate and preserve the Restricted Revenues for payment of the Constitutional Debt.

The Bondholders filed their complaint as an adversary proceeding under Section 310 of PROMESA on June 27, 2017. The Board moved to dismiss on August 21, 2017 for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), respectively. The district court held a hearing on the Board's request on December 5, 2017, and thereafter granted the Board's motion to dismiss on January 30, 2018.

In its opinion, the district court resolved that it lacked subject matter jurisdiction to entertain Counts 3 to 8 of the Bondholders' complaint. It noted that Counts 3 to 7 sought improper advisory opinions because these counts asked for "abstract declarations of the parties' respective relationships to the subject revenues, without application of the relief to resolve any current concrete dispute, such as a claim objection proceeding, request for adequate protection or relief from stay, or confirmation-related proceeding." As to Count 8, the court concluded that it presented an unripe Takings Claim because the Commonwealth had made no final decision regarding the treatment of the revenues at issue. The court also ruled that the relief sought in Counts 1, 2, and 9 through 11 must be disallowed because it "would directly restrict the Commonwealth's use of its revenues

and its exercise of political and governmental powers," an outcome prohibited under Section 305 of PROMESA.

The Bondholders then appealed, challenging the dismissal of all counts except for that of Counts 7 and 11.

**II.**

We review dismissals for lack of subject matter jurisdiction de novo. Town of Barnstable v. O'Connor, 786 F.3d 130, 138 (1st Cir. 2015). The same lens of appellate review applies to dismissals for failures to state a claim. Newman, 901 F.3d at 24.[3] In so doing, we "construe the [c]omplaint liberally and treat all well-pleaded facts as true," with the Bondholders receiving "the benefit of all reasonable inferences." Town of Barnstable, 786 F.3d at 138. When the district court, however, "accurately takes the measure of a case, persuasively explains its reasoning, and reaches a correct result, it serves no useful

---

[3] In the past, we have deployed an abuse of discretion standard when reviewing a district court's grant or denial of declaratory relief. See, e.g., Verizon New England, Inc. v. Int'l Bhd. Of Elec. Workers, Local No. 2322, 651 F.3d 176, 187 (1st Cir. 2011); Animal Welfare Inst. v. Martin, 623 F.3d 19, 29 (1st Cir. 2010); Rossi v. Gemma, 489 F.3d 26, 38 (1st Cir. 2007). Here, however, de novo review is warranted because the district court found it had no discretion in deciding whether to issue Bondholders' requested declaratory judgments. Rather, the district court concluded from the outset that it could not even entertain the Bondholders' requests because it lacked jurisdiction over some counts, while it found that other counts contravened Section 305 of PROMESA. In any event, we would reach the same result under either standard.

-10-

purpose for a reviewing court to write at length in placing its seal of approval on the decision below." Moses v. Mele, 711 F.3d 213, 216 (1st Cir. 2013).

The Bondholders first ask us to reverse the district court's dismissal of Counts 3 to 6 of their complaint. As discussed before, Counts 3 and 4 sought declarations that the Bondholders -- and not the Commonwealth -- possess an equitable and beneficial property interest in the "Restricted Revenues." Counts 5 and 6 similarly sought declarations, but this time that the Bondholders also have a statutory lien over the same revenues. The Bondholders argue that dismissing these counts as non-justiciable contravenes settled understandings of Article III and the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201. The Bondholders also allege that their "requested declarations would facilitate the process of formulating a plan of adjustment for the Commonwealth that will comply with PROMESA's requirement for confirmation of a plan." Further, the Bondholders maintain that "[p]rompt clarification" of their rights would offer "critical guidance" in the buildup to the plan confirmation stage. In response, the Board insists that dismissal was appropriate because "the requested declarations related only to abstract rights and relationships, without any immediate effect on the parties' conduct, and did not conclusively resolve any dispute between the

parties."  The Bondholders' arguments give us no reason to set aside the dismissal of these counts.

Our federal courts can only entertain actual cases and controversies, see U.S. Const. art. III, § 2, cl. 1, and the DJA allows district courts to grant declaratory relief, but this authority is also limited to cases of actual controversy, 28 U.S.C. § 2201(a).  The Supreme Court has explained that the DJA's "case of actual controversy" requirement refers to the cases and controversies that are justiciable under Article III.  Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937).  This means that the DJA "does not itself confer subject matter jurisdiction, but, rather, makes available an added anodyne for disputes that come within the federal courts' jurisdiction on some other basis." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534 (1st Cir. 1995) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 15-16 (1983)).

To determine if the declaratory relief is sought within a case of actual controversy, district courts must examine "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941) (emphasis added); see

-12-

also Aetna, 300 U.S. at 241 (describing a justiciable controversy as "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts").  The Supreme Court has further remarked that, in evaluating requests for declaratory relief, courts shall exercise

> [a] maximum of caution . . . where a ruling is sought that would reach far beyond the particular case . . . The disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them.

Pub. Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 243-44 (1952).  In the absence of an actual controversy, federal courts cannot issue advisory opinions.  Golden v. Zwickler, 394 U.S. 103, 108 (1969).

Although the Bondholders' allegations in support of Counts 3 to 6 demonstrate that a substantial controversy exists between them and the Board, such a controversy is not sufficiently immediate or real to warrant declaratory relief.  See Maryland, 312 U.S. at 273.  Again, the Bondholders seek two things through these counts.  First, a declaration that the Bondholders have, and the Commonwealth lacks, an equitable and beneficial property interest in the "Restricted Revenues."  Second, a declaration that they possess a statutory lien over the "Restricted Revenues."  The

-13-

Bondholders, however, fail to show that the relief requested would, if granted, settle "some dispute which affects the behavior of the defendant towards the plaintiff[s]." Hewitt v. Helms, 482 U.S. 755, 761 (1987) (emphasis omitted). To the contrary, the declarations would "reach far beyond the particular case" as they unleash ramifications to be resolved in future litigation and implicate the potential claims of other creditors without them having a say in the current suit. Wycoff, 344 U.S. at 243; see id. at 244 ("The disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them.").

Moreover, like the district court noted below, the Bondholders' requests seek abstract declarations that are unrelated to any current concrete dispute, such as a claim objection proceeding, request for adequate protection or relief from stay, or confirmation-related proceeding. See Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (noting "that a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" (citations omitted)). Indeed, the eventual

-14-

presentation of the Commonwealth's plan of adjustment before the Title III court will probably address the claims averred in each of the counts at issue, and at that time the Bondholders and other creditors will be able to present their claims prior to plan confirmation. See 48 U.S.C. §§ 2172, 2174. Thus, we agree with the district court that the Bondholders' request for declaratory judgments in Counts 3 to 6 was non-justiciable and affirm its dismissal of these counts for lack of subject matter jurisdiction.

Next, the Bondholders seek our review of the district court's dismissal of Count 8 as unripe. In this count, they request a declaration that the Commonwealth's diversion, without just compensation, of the "Restricted Revenues" for purposes other than the payment of "Constitutional Debt" "would constitute" an unlawful taking under the Fifth Amendment. (Emphasis added). The district court concluded that this count "presents a different combination of barriers to justiciability -- a hypothetical factual context and an unripe claim." Specifically, the district court found that the very language the Bondholders used (i.e., that any diversion of the "Restricted Revenues" "would constitute" an unlawful taking) laid bare the hypothetical nature of their request. We agree.

To assert a takings claim, plaintiffs "must demonstrate that (1) [they] 'received a final decision from the state on the

-15-

use of [their] property,' and (2) 'sought compensation through the procedures the [s]tate has provided for doing so.'" García-Rubiera v. Calderón, 570 F.3d 443, 451 (1st Cir. 2009) (citing Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 194 (1985)). A plaintiff that does not assert these "two independent prudential hurdles" fails to establish a takings claim that is ripe for adjudication. Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1, 13 (1st Cir. 2007) (quoting Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 733-34 (1997)).

First things first: The declaration that the Bondholders seek in Count 8 reveals, most literally, that a taking has yet to occur. The only reasonable interpretation of the words "would constitute" is that they want a declaration about the legality of actions that the Commonwealth may undertake in the future. Such a claim, in our view, captures the basic essence of a claim that is unripe. See Williamson Cty., 473 U.S. at 186-87.

But if that were not enough, it is also easy to see how the Bondholders' allegations fail the two-pronged test of Williamson County. Nowhere do the Bondholders allege that the Commonwealth "has arrived at a definitive position" regarding any disbursement of "Restricted Revenues" that may "inflict[] an actual, concrete injury" upon them for Takings Clause purposes.

-16-

See García-Rubiera, 570 F.3d at 452. Under PROMESA, no claims will be discharged, and no determinations will be made about the treatment of claims, until the plan of adjustment is confirmed, see 48 U.S.C. § 2174, for which the Bondholders have not received a final decision from the Commonwealth on the status of their alleged property. We therefore need delve no further to affirm the district court's dismissal of Count 8 as unripe.

The Bondholders' final ask is that we reverse the dismissal of Counts 1, 2, 9, and 10 for failure to state a claim. Counts 1 and 2 called for declarations that the Commonwealth cannot use or collect the "Restricted Revenues" for any purpose other than paying the debt owed to the Bondholders, whereas Counts 9 and 10 sought declarations that the "Restricted Revenues" must be segregated and deposited into a designated account and not be used for anything but repayment of "Constitutional Debt." The district court found that Section 305 of PROMESA barred it from providing the relief sought in these counts. According to the court, if granted, the relief demanded would "result in declarations . . . that . . . directly restrict the Commonwealth's use of its revenues and its exercise of political and governmental powers."

Fashioned after Section 904 of the Bankruptcy Code, 11 U.S.C. § 904, Section 305 of PROMESA establishes that:

> [N]otwithstanding any power of the court, unless the Oversight Board consents or the plan so provides, the

-17-

> court may not, by any stay, order, or decree . . . interfere with -- (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the use or enjoyment by the debtor of any income-producing property.

48 U.S.C. § 2165 (emphasis added). We recently addressed the scope of this provision in In re Fin. Oversight and Mgmt. Bd. for P.R., 899 F.3d 13 (1st Cir. 2018). There, we observed that Section 305 is "respectful and protective of the status of the Commonwealth and its instrumentalities as governments, much like [S]ection 904 of the municipal bankruptcy code." Id. at 21. We accordingly concluded that Section 305 "bar[s] the Title III court itself from directly interfering with the debtor's powers or property" because doing so would "impinge[] on [the Commonwealth's] autonomy." Id.

Before us, however, the Bondholders contend that their desired declarations would not "interfere" with the Commonwealth's authority because a declaratory judgment does not mandate compliance. To sustain this argument, the Bondholders point us to Steffel v. Thompson, 415 U.S. 452 (1974). In that case, the Supreme Court remarked that "even though a declaratory judgment has 'the force and effect of a final judgment,' 28 U.S.C. § 2201, it is a much milder form of relief than an injunction. Though it may be persuasive, it is not ultimately coercive; noncompliance with it may be inappropriate, but it is not contempt." Id. at 471. (citations omitted). For its part, the Board insists that

-18-

the district court was correct to dismiss since the declarations at issue would, plainly put, direct the Commonwealth how it can use and administer some of its revenues. Here again we agree that dismissal of these counts was required. We find no way around the fact that -- absent the Board's consent or a provision in a plan of adjustment -- the requested declarations would constitute decrees that unlawfully interfere with the autonomy of the Commonwealth and its entities in the use of the "Restricted Revenues." See 48 U.S.C. § 2165.

Although the Bondholders are right to say that declaratory judgments do not carry the same force as injunctions, it is still "substantially likely that [the Commonwealth] would abide" by a declaration of the district court "even though [it] would not be directly bound by such a determination." Franklin v. Massachusetts, 505 U.S. 788, 803 (1992). The Supreme Court even recognized as such in Steffel. See 415 U.S. at 471. Because noncompliance with declaratory judgments is deemed inappropriate, the Court explained, parties are usually persuaded to act according to judicial declarations. See id. In other instances, the Court has also characterized declaratory relief as interfering with a state's administration of its law. See, e.g., Kugler v. Helfant, 421 U.S. 117, 131 (1975); Zemel v. Rusk, 381 U.S. 1, 19 (1965). Thus, had it conceded the relief the Bondholders sought in Counts

1, 2, 9, and 10, the district court would have directed the Commonwealth about how it must handle and disburse the "Restricted Revenues" -- an impermissible interference under Section 305 of PROMESA without the Board's consent or relevant authorization in a plan of adjustment. See 48 U.S.C. § 2165. This conclusion is consistent with how other courts have interpreted the plain language of Section 904 of the Bankruptcy Code, 11 U.S.C. § 904, the analogue to PROMESA's Section 305. See In re City of Detroit, Mich., 841 F.3d 684, 696 (6th Cir. 2016) (noting that "[a] declaration that [debtor's] practices are illegal or unconstitutional" interferes with the debtor's autonomy contra Section 904); In re City of Stockton, 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012) (concluding that Section 904 "can only mean that a federal court can use no tool in its toolkit -- no inherent authority power, no implied equitable power, no Bankruptcy Code § 105 power, no writ, no stay, no order -- to interfere with a [debtor] regarding political or governmental powers, property or revenues, or use or enjoyment of income-producing property" (emphasis added)).

The district court, therefore, was correct to hold that Section 305 of PROMESA precludes it from granting the relief requested in Counts 1, 2, 9, and 10, and it properly dismissed

those counts for failure to state a claim upon which relief may be granted.

### III.

For the foregoing reasons, the district court correctly dismissed the Bondholders' complaint, and its judgment is affirmed.

**<u>Affirmed.</u>**